[No. A085837. First Dist., Div. Four. July 13, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
JESUS MARIA ESCOBAR, Defendant and Appellant.

**COUNSEL**

Cynthia A. Thomas, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Stan M. Helfman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SEPULVEDA, J.**—Jesus Maria Escobar timely appeals from a judgment of conviction entered after a jury found him guilty of the first degree murder of his wife, Patricia Escobar. (Pen. Code, § 187.) The jury also found true an allegation that he personally used a firearm in the commission of the murder. (Pen. Code, § 12022.5.) Appellant was sentenced to state prison for a term of 29 years to life.

Appellant contends that the trial court's decisions to admit evidence of a 1992 incident of domestic violence pursuant to Evidence Code section 1109,[1] and to instruct the jury with CALJIC No. 2.50.02 about the permissible use of such evidence, deprived him of his constitutional rights to due process and a fair trial. Appellant further contends that the trial court abused its discretion by allowing a rebuttal witness to testify about statements Patricia made three weeks before her death, regarding her desire to leave appellant and his threats to kill her if she did. Finding no reversible error as to any of appellant's claims, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant had been married to Patricia for 22 years when he shot her to death on October 3, 1997. When they married, Patricia already had two children (Rocio Escobar and Myrna Cecil) from a prior marriage. Appellant also had two children from a prior marriage. One of appellant's children, Elkin Escobar, testified at trial. During the marriage, appellant and Patricia had two children (Charlie Escobar and Cheryl Escobar) together. At the time of Patricia's death, Rocio was 25 years old, Myrna was 24, and Cheryl was 17. Cheryl was the only child still living in her parents' home.

The relationship between appellant and Patricia was marked by marital discord including violence, quarrels, and hostility. For example, in October 1992, Patricia reported an incident of domestic violence to the Newark Police Department. She told Officer Robert Douglas that she and appellant had been arguing and that she had raised her hand as if to strike appellant. Appellant then punched her in the left eye with his fist, causing bruising, a

---

[1] All statutory references are to the Evidence Code unless otherwise indicated.

small cut, and some bleeding. There was more pushing and grabbing. Patricia bit her husband on his left pinkie finger, and was able to escape. Officer Douglas took a Polaroid photograph of Patricia's injuries, which was shown to the jury in this case. Appellant was not arrested in connection with this 1992 incident.

In June 1997,[2] Patricia suggested that she and appellant take separate vacations. In July, Patricia went to Colombia and Florida by herself. Appellant grew increasingly suspicious of his wife because, while she was away, she was spending a lot of money and appellant was at times unable to contact her. Appellant said he believed she was having an affair with someone while she was on vacation. When she returned, appellant asked her about the money she had spent and her only response was that she wanted to enjoy life. According to appellant, Patricia also said she wanted more freedom, but never specifically told him she wanted to divorce him.

After Patricia returned from her vacation, the marriage became even more strained. Patricia no longer took care of the household responsibilities and was away from home frequently. She told appellant she was out with her girlfriends. Cheryl described her mother as acting more like a teenager than a mother. Cheryl said her mother often commented that she had raised her children and did not want any more responsibilities. At one point, Cheryl told her mother to leave if that was what she wanted. Her mother got mad and said she was not going anywhere.

Appellant became depressed about Patricia's behavior. He contemplated suicide several times during the summer of 1997. Once, Cheryl found appellant in the garage crying and holding a knife to his stomach. He was making statements about killing himself. Cheryl convinced him not to do it.

During the week of September 21, Myrna came from her home in Texas to visit her parents, in part because of her concern about the possible breakup of their marriage. On or about September 28, Myrna and her parents took a trip to San Francisco. While they were riding a BART train, Myrna heard Patricia tell appellant that within two weeks she wanted him to leave, or she would pack her things and leave. Appellant looked upset by this information. Appellant and Cheryl denied that Patricia made such a statement during the San Francisco outing.

On September 29, appellant called a former coworker and "gun collector," Robert Steele, to ask about buying a handgun. Steele said he had a .38-caliber Charter Arms revolver he would sell for $200. On Wednesday,

---

[2]All further dates in this part are in 1997.

October 1, Steele delivered the weapon to appellant at his house. Appellant had Steele park his truck in front of appellant's house. Appellant got into the truck and paid Steele $200 for the gun. Steele asked appellant what he planned to do with the weapon. Appellant said he was going to work with his brother in Florida and wanted the gun for protection. Appellant was also at times very despondent about the breakup of his marriage and had considered killing himself with the gun. Steele told appellant he could purchase ammunition at a nearby Kmart store.

On Thursday, October 2, appellant went to the Kmart store and asked for hollow-point bullets. The clerk told appellant the store did not sell hollow-point bullets, so appellant purchased a box of ordinary .38-caliber shells. After purchasing the bullets, appellant returned home and loaded the gun to see if the bullets fit. The revolver held five rounds. Appellant then placed the loaded gun in a toolbox in the garage. After appellant bought the gun and bullets he warned his wife saying, "[D]on't leave because I love you. I kill." Appellant also told Elkin that he was going to kill his wife.

Appellant organized a barbecue for his family for the evening of Friday, October 3. Appellant came home early from work, at approximately 1:00 p.m. Myrna testified that appellant seemed upset during the afternoon because Patricia had not returned home from work. When Patricia arrived home at approximately 4:00 p.m., appellant questioned her about where she had been. Patricia said she had come home directly from work, but appellant became angry and accused her of lying. He told her he had contacted her employer and had been told she left at noon. Patricia became upset at this and told appellant to stop making their personal life public.[3] Eventually, things appeared to calm down between appellant and Patricia.

Rocio, Myrna, Cheryl, and Elkin were present for the barbecue, along with Elkin's two-year-old daughter Alexandria, and Myrna's two-year-old son Cordel. Appellant cooked and the family ate dinner at approximately 6:00 p.m. Appellant and Patricia appeared to be getting along. Shortly after dinner, Patricia went to bed as she had a 4:00 a.m. work shift the next morning. Appellant stayed up and socialized with the family, drinking tequila and water. Elkin left soon after dinner. Sometime after 7:00 p.m., appellant told Rocio she was the daughter he never had and told Myrna he loved her. He asked Myrna, "You will take my son, won't you?" Thinking this was an unusual thing to say, Myrna nevertheless responded, "Sure." Appellant called a friend in Colombia and told him things were not the same. Cheryl told the police that appellant asked her, "What should I do?" and "Should I kick your mom's butt?"

---

[3]In a statement to police following his arrest, appellant said he had loaded his handgun on the afternoon of October 3, after hearing his wife's "bullshit" story about where she had been.

At approximately 10:00 p.m., appellant entered the bedroom and argued with Patricia. Patricia told appellant to leave her alone because she had to sleep. Soon thereafter, appellant and Patricia went into the garage. Patricia was dressed in shorts and a T-shirt, and had her keys with her. Myrna and Cheryl heard their mother scream, "No Chucho!" This was followed by the sounds of several gunshots, and another scream by the victim. Rocio, Cheryl, and Myrna ran into the garage. They found Patricia sprawled out on the garage floor in front of her car. Appellant was backing away from her body, holding a .38-caliber handgun. Rocio and Cheryl begged appellant not to hurt their mother anymore. Myrna went to a phone in the garage and called 911. Appellant held the gun to his head and said, "You don't love me," and indicated that he was going to kill himself. Cheryl and Rocio stepped between appellant and Patricia, begging him to help their mother and to put the gun down. Cheryl grabbed at appellant to get him to stop but, despite the pleas of his daughters, appellant pulled away, walked over to Patricia, and shot her a fourth and final time in the head. Appellant said to Cheryl, "I'm hurt. You know me. She hurt me real bad. She cheated on me. She was going to leave me. And, you know, I need her. I have to kill myself because I can't go to jail and leave you like this."

Newark police officers soon arrived on the scene. Officer Robert Baswell saw appellant standing in front of the garage with a gun to his head, and saw Cheryl pulling on appellant's arm saying, "Help her." Appellant said, "I just fucking shot my wife. I'm going to kill myself." Appellant looked at the officer and ran through the garage to the master bedroom. Cheryl followed him. Appellant barricaded himself in the bedroom and refused to come out. Appellant said he'd rather kill himself than go to prison. Officer Daniel Cohen heard him say, "I'm going to kill myself and [my daughter's] going with me." After approximately 40 minutes in the bedroom, appellant fired a final shot into the ceiling of the bedroom. He was then taken into custody.

After he was arrested, appellant gave a taped statement to Detective Allen Chen. Chen testified that appellant was able to understand his questions and give a coherent statement. A blood test drawn from appellant at 3:10 a.m. on October 4 indicated a blood-alcohol level of .17 percent.

Dr. Sharon Van Meter testified at trial about the autopsy she had performed on Patricia. Four bullets had penetrated Patricia's body: a shot to the head that entered the temple area and exited via her eye; a shot to the head that entered the back of the head and remained lodged in her brain; a shot into the back that had exited the chest; and a shot into the left arm that pierced the heart, exited the body, and lodged in the right arm. Three of the wounds showed stippling or powder burns, indicating that Patricia had been

shot at close range, less than two feet away. Three of the wounds were immediately fatal. One was possibly survivable if the victim had received immediate medical attention.

Appellant's phone calls were monitored while he was in jail just before the beginning of trial. In conversations with Cheryl, appellant told her to say her mother was "a whore" and that "[s]he was in the streets for money." Appellant also told Cheryl that he and she had to be "in accord," as follows: "I have to call because I have to tell you things that you have to say. You are going to say one thing, I am going to say one thing. I'm going to say one thing. You're going to say something else. We cannot say two different things. Are you understanding me what I'm telling you?"

When appellant testified at trial, he claimed he bought the gun and bullets for self-protection in the event he took a trip to Florida, not to kill his wife. He said he was very hurt by his wife's lies and behavior. Regarding the events of October 3, he said he had been drinking a considerable amount of brandy and tequila at the barbecue. When he went into the bedroom, his wife got angry and kicked him in the testicles. He returned to the living room and danced with his daughter Rocio. He returned to the bedroom 35 to 45 minutes later but his wife was not there, so he looked for her in the garage. They argued, and Patricia said very insulting things to him. He went to the toolbox to get the gun to shoot himself. Patricia continued to insult him. When she told him she had slept with another man in his bed, he got close to her and shot her. He got close to her and shot her again.

Called as a rebuttal witness, Officer Chen testified that appellant did not say anything about insulting statements made by his wife when he gave his taped statement on October 4. Nor did he report that Patricia had kicked him in the testicles or that they had had an altercation in the garage. The only thing appellant claimed Patricia had said before he shot her was "Fuck you."

Also called as a rebuttal witness, Ada Hernandez said that approximately three weeks prior to the shooting, she asked Patricia for a ride home from work. During this trip, Patricia began crying. Hernandez asked Patricia if she was having problems with appellant. Over appellant's objection on hearsay grounds, Hernandez was allowed to recount Patricia's answer as follows: "[Y]es. The problem is I want to get a divorce. I don't want to live with him any longer. But at the [same] time, I'm afraid of him because he already told me that if I leave him he is going to kill me. [¶] She said she couldn't do it on her own because she is afraid he will kill her. [¶] And I told her that if she couldn't do it on her own, for her to seek some help."

Hernandez's testimony was corroborated in part and contradicted in part by testimony from a family friend, Mary Maldonado. Called as a witness for

the defense, Maldonado testified that in the third or fourth week of September 1997, Patricia and Maldonado had discussed "getting a place together" or having Patricia move in with Maldonado while she sorted out her marital problems. According to Maldonado, Patricia did not at that time claim she was afraid of appellant and "never" claimed appellant threatened to kill her if she left him. Rather, Patricia told Maldonado that appellant had talked about killing himself and Patricia had "sort of snickered" and said, "If that's what he had to do, go ahead and do it." However, Maldonado also contradicted herself with testimony about how Patricia and appellant had celebrated Patricia's birthday during the third week of September, an event Maldonado described as follows: "Jesus and her went out, they were happy. They were holding hands. He got her a ring. She was happy."

## II. DISCUSSION

### A. *Admitting Evidence Pursuant to Section 1109 and Instructing the Jury with the 1997 Version of CALJIC No. 2.50.02 Did Not Deprive Appellant of Due Process.*

The prosecution moved in limine for an order allowing the introduction of evidence of three prior incidents of domestic violence committed by appellant against his wife. Pursuant to section 1109,[4] the trial court allowed the prosecution to present the testimony of Officer Douglas, as recounted above, regarding the 1992 incident in which Patricia reported that appellant had punched her in the eye with his fist, along with appellant's explanation that he was defending himself. Appellant timely objected to this testimony as improper propensity evidence and a violation of his due process rights.

---

[4]Since it became effective on January 1, 1997, section 1109 has provided: "(a) Except as provided in subdivision (e), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352. [¶] (b) In an action in which evidence is to be offered under this section, the people shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, in compliance with the provisions of Section 1054.7 of the Penal Code. [¶] (c) This section shall not be construed to limit or preclude the admission or consideration of evidence under any other statute or case law. [¶] (d) As used in this section, 'domestic violence' has the meaning set forth in Section 13700 of the Penal Code. [¶] (e) Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." In relevant part, Penal Code section 13700 provides: "As used in this title: [¶] (a) 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another. [¶] (b) 'Domestic violence' means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship."

Appellant also argued that the evidence should be excluded pursuant to section 352 because its prejudicial effect outweighed its probative value. However, after hearing arguments on the motion in limine, the trial court refused to allow two of the couple's children to testify about a long history of threats and violence by appellant. The trial court ruled that the incidents were too remote in time and exercised its discretion to exclude the evidence pursuant to section 352 as more prejudicial than probative.

At the close of the evidence, the court instructed the jury with CALJIC No. 2.50.02,[5] regarding permissible use of the evidence about the 1992 incident. The court gave several other instructions on the requirement of proof beyond a reasonable doubt; the elements of murder, including the specific intent requirements; the sufficiency of the testimony of a single credible witness as proof of any fact, and the duty to consider all the evidence upon which proof of a fact depends; the requirement of proof of each element independent of any confession by the defendant; and the requirement that the jury consider the instructions as a whole and each in light of all the others. However, the trial court did not instruct the jury with CALJIC No. 2.50.1.[6]

Appellant's principal contention on appeal is that admission of evidence of the 1992 incident pursuant to section 1109 was improper and violative of his right to due process and a fair trial. Appellant further contends that the giving of CALJIC No. 2.50.02, which advised the jury about the permissible use of evidence of prior domestic violence, allowed the jury to convict him of first degree murder without proof beyond a reasonable doubt of the elements of that offense. We will discuss each of these issues in turn.

---

[5]The 1997 version of CALJIC No. 2.50.02 was given to the jury, as follows: "Evidence has been introduced for the purpose of showing that the defendant engaged in an offense involving domestic violence on one or more occasions other than that charged in the case. [¶] 'Domestic violence' means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the defendant has had a child or is having or has had a dating relationship. . . . [¶] 'Abuse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself or another. [¶] If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type offense. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime with which he is now accused. [¶] Unless you are otherwise instructed, you must not consider this evidence for any other purpose."

[6]In pertinent part, CALJIC No. 2.50.1 provides: "Within the meaning of [CALJIC No. 2.50.02], the prosecution has the burden of proving by a preponderance of the evidence that [the] defendant committed a crime other than that for which he is on trial. [¶] You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that [the] defendant committed the other crime."

1. *Section 1109 Issues.*

In order to establish a due process violation, appellant bears a heavy burden of showing that admission of evidence pursuant to section 1109 unduly offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. (*Montana v. Egelhoff* (1996) 518 U.S. 37, 43-44 [116 S.Ct. 2013, 2018, 135 L.Ed.2d 361]; *Medina v. California* (1992) 505 U.S. 437, 444-446 [112 S.Ct. 2572, 2576-2577, 120 L.Ed.2d 353]; *Patterson v. New York* (1977) 432 U.S. 197, 201-202 [97 S.Ct. 2319, 2323, 53 L.Ed.2d 281].) As our Supreme Court recently observed: "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*); see also *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [112 S.Ct. 475, 4841, 116 L.Ed.2d 385]; *Spencer v. Texas* (1967) 385 U.S. 554, 562-564 [87 S.Ct. 648, 652-653, 17 L.Ed.2d 606].)

In *Falsetta*, the court considered a due process challenge to section 1108, a provision similar to section 1109 in that it permits the admission of a defendant's other sex crimes for the purpose of showing a propensity to commit those crimes. Borrowing liberally from the analysis in *People v. Fitch* (1997) 55 Cal.App.4th 172, 177-184 [63 Cal.Rptr.2d 753], in which the Third Appellate District had upheld section 1108 in the face of a due process challenge, the *Falsetta* court held as follows: "[W]e think the trial court's discretion to exclude propensity evidence under section 352 saves section 1108 from defendant's due process challenge. As stated in *Fitch,* '[S]ection 1108 has a safeguard against the use of uncharged sex offenses in cases where the admission of such evidence could result in a fundamentally unfair trial. Such evidence is still subject to exclusion under . . . section 352. (. . . § 1108, subd. (a).) By subjecting evidence of uncharged sexual misconduct to the weighing process of section 352, the Legislature has ensured that such evidence cannot be used in cases where its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (. . . § 352.)' " (*Falsetta, supra,* 21 Cal.4th at p. 917.)

Admission of evidence of prior acts of domestic violence under section 1109 is similarly subject to the limitations of section 352. (§ 1109, subd. (a).) Under the reasoning of *Falsetta*, this safeguard should ensure that section 1109 does not violate the due process clause. (See *Falsetta, supra,* 21 Cal.4th at p. 917.) Since *Falsetta* was decided, several cases from the California Courts of Appeal have applied its reasoning to reject claims that

admission of prior acts of domestic violence pursuant to section 1109 violates due process. (*People v. James* (2000) 81 Cal.App.4th 1343, 1353 [96 Cal.Rptr.2d 823] (*James*); *People v. Brown* (2000) 77 Cal.App.4th 1324, 1335 [92 Cal.Rptr.2d 433] [same]; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027-1028 [92 Cal.Rptr.2d 208] [same]; *People v. Johnson* (2000) 77 Cal.App.4th 410, 417-420 [91 Cal.Rptr.2d 596] [same].) We agree with the rule of these recent cases and, accordingly, reject appellant's due process claim.

 Appellant contends, however, that evidence about the 1992 incident was inadmissible under section 1109 because it did not rise to the level of "domestic violence" and because its probative value was outweighed by the risk of undue prejudice to him. We disagree.

Because appellant disputed Patricia's version of events and claimed he acted in self-defense, and because no conviction resulted from the 1992 incident, there may have been a question of fact whether the incident rose to the level of a criminal offense. (See, e.g., Pen. Code, § 273.5.) However, the evidence gave rise to a straightforward issue of credibility such that a jury quite reasonably could have found—by a preponderance of the evidence or beyond a reasonable doubt—that appellant committed prior "domestic violence" as that term is used in section 1109. It is, at a minimum, more than fair to characterize appellant's conduct, as reported by Patricia to Officer Douglas, as "intentionally or recklessly causing or attempting to cause bodily injury" to a spouse. (Pen. Code, § 13700.)

Appellant is correct that admissibility under section 352 is a prerequisite to the introduction of evidence of prior incidents of domestic violence. (§ 1109, subd. (a).) However, we have no doubt that the trial court decided to allow evidence of the 1992 incident only after taking this requirement into account, exercising its discretion, and properly finding that the evidence was not inadmissible under section 352. The trial court did, after all, evaluate the prosecution's request to admit evidence of three separate domestic violence incidents in light of appellant's objections under sections 352 and 1109, and rejected all but Officer Douglas's testimony because the incidents to which Myrna and Rocio would have testified had occurred more than six years earlier.

Moreover, even accepting (without deciding) appellant's claim about the low probative value of the 1992 incident as evidence of his "propensity" to commit further acts of domestic violence, we are convinced the trial court could also quite reasonably find the prejudicial effect of that one five-year-old incident to be de minimis, such that the probative value of the evidence

was not "substantially outweighed" by the danger of undue prejudice. (§ 352.) Especially in the present context, evidence that appellant punched his wife in the face on one occasion in 1992 in the course of what might have been "mutual affray," may not have had much predictive value with respect to future acts of domestic violence. But it was, in any event, very *unlikely* to have a significant impact on a jury hearing undisputed evidence about his extraordinarily violent conduct on October 3, 1997. While reasonable minds could differ as to admissibility of the 1992 incident, it was not an abuse of discretion to allow the prosecution to present Officer Douglas's testimony over appellant's section 352 objection.

### 2. *CALJIC No. 2.50.02.*

Appellant further contends that CALJIC No. 2.50.02 allowed the jury to "conclude that the prosecution had no duty to prove the current offense," and "diluted the requisite burden of proof to less than the reasonable doubt standard." More precisely, he claims there is a reasonable likelihood that the jury, following the express terms of CALJIC No. 2.50.02, could have found that he "did commit" first degree murder based *solely* upon evidence about the 1992 incident and the permissible inference of propensity to commit domestic violence that arises therefrom. We reject these arguments.

A number of recent appellate court cases have grappled with questions similar to those raised by appellant, and a split of authority has emerged. In two recent cases, the courts held there was a reasonable likelihood that former CALJIC No. 2.50.01,[7] with or without CALJIC No. 2.50.1, might have misled jurors into believing they could infer the defendant's guilt merely from his commission of a prior offense. (*People v. Orellano* (2000) 79 Cal.App.4th 179, 186 [93 Cal.Rptr.2d 866] [giving of CALJIC Nos. 2.50.01 and 2.50.1 was reversible error despite the giving of standard reasonable doubt instructions, because the court had no way of knowing whether the jury applied the correct burden of proof]; *People v. Vichroy* (1999) 76 Cal.App.4th 92, 99-101 [90 Cal.Rptr.2d 105][even where jury was instructed to determine beyond a reasonable doubt whether the defendant committed the prior offenses, it was reversible error to permit the jury to convict the defendant based *solely* on a finding that he had committed prior sexual offenses].)

In another line of cases the courts have decided that, when the challenged instructions were considered together with those on reasonable doubt and the

---

[7]CALJIC Nos. 2.50.01 and 2.50.02 are virtually identical in defining permissible use(s) of, respectively, evidence of a prior "sexual offense" or a prior "offense involving domestic violence" as proof of the defendant's propensity to commit a similar offense as charged in the current case. Because there is no material difference between CALJIC No. 2.50.01 and 2.50.02, cases decided with respect to these instructions are—at least for present purposes—interchangeable.

elements of the charged offense, there was no reasonable likelihood that the jury would return a conviction based on an unconstitutionally lenient standard of proof or on evidence of uncharged offenses alone; thus, no error arose from the use of former CALJIC No. 2.50.01 and CALJIC No. 2.50.1. (*People v. Waples* (2000) 79 Cal.App.4th 1389, 1396-1398 [95 Cal.Rptr.2d 45] (*Waples*); *People v. O'Neal* (2000) 78 Cal.App.4th 1065, 1078-1079 [93 Cal.Rptr.2d 248] (*O'Neal*); *People v. Regalado* (2000) 78 Cal.App.4th 1056, 1063-1064 [93 Cal.Rptr.2d 83] (*Regalado*); *People v. Van Winkle* (1999) 75 Cal.App.4th 133, 147-149 [89 Cal.Rptr.2d 28] (*Van Winkle*).)

The *Regalado* court's discussion of this issue is, perhaps, the most complete and useful. In *Regalado*, the defendant objected to the language in CALJIC No. 2.50.01, which permitted the jury to infer he committed the sexual offense of which he was accused if it found by a preponderance that he was disposed to commit that or a similar type of crime. (*Regalado, supra,* 78 Cal.App.4th at p. 1061.) He claimed the instruction short-circuited the general instruction in CALJIC No. 2.90, which requires the prosecutor to prove every element beyond a reasonable doubt. The *Regalado* court rejected the defendant's claim, offering an analysis that—except for the nature of the prior and current offenses—applies as well to the instant case: "Adopting the analysis of the Court of Appeal in *People v. Falsetta, supra,* 21 Cal.4th at page 923, our Supreme Court referred to the language Regalado objects to as a 'useful nugget[]' which 'would guide the jury in its proper consideration of evidence of sex offenses admitted under section 1108.' The reason behind the court's approval seems apparent. [¶] While it is axiomatic that every element of a criminal offense must ultimately be proven beyond a reasonable doubt [citation], it is also settled that the admissibility of evidence which may be relevant to a jury's factual determinations is dependent upon a different standard: proof by a preponderance of the evidence. [Citations.] Thus, to the extent the court's instructions permitted the jurors to consider Regalado's disposition to molest young boys as evidence that he, in fact, committed the charged offense, the court did not err—so long as the existence of his disposition was proved by a preponderance of the evidence. It was. [¶] We are, of course, aware that the second 'useful nugget[]' in the *Falsetta* instruction—which would have admonished the jury not to convict solely because it found the defendant committed the prior offense—was not given as part of the instruction in this case. [Citation.] The additional language was not incorporated into CALJIC No. 2.50.01 until early in 1999[8]—well after the trial of this case. But the omission of the admonishment is not fatal to the instruction that was given. [¶] If our task were to

_____

[8] In 1999, CALJIC Nos. 2.50.01 and 2.50.02 were amended to add the following penultimate paragraph: "However, if you find [by a preponderance of the evidence] that the defendant committed a prior sexual offense[s], that is not sufficient by itself to prove [beyond

consider CALJIC No. 2.50.01 in isolation, Regalado might have a better argument. But we are obliged to consider the effect and import of the court's jury instructions as a whole. [Citations.] One of the primary reasons we are required to consider them that way is that jurors are told to do the same thing. CALJIC No. 1.01, which the court read to Regalado's jury, requires that jurors '[c]onsider the instructions as a whole and each in light of the others.' [¶] In the court's instructions, the jurors were told Regalado's disposition to commit sexual offenses could be used as a basis for inferring he committed the crime charged. But they were also told the specific elements of the charged offense (by way of CALJIC No. 16.440, along with lesser included offense instructions) and that each of those elements had to be proven beyond a reasonable doubt (CALJIC No. 2.90). [¶] Given these instructions, and considering them as a whole, we think a reasonable jury would have believed it was entitled to consider Regalado's disposition to commit the offense as evidence that he committed the crime charged, so long as the prosecution proved his earlier culpability by a preponderance of the evidence. That is, after all, the law. [Citation.] However, the jury could not possibly have stopped there—because CALJIC No. 2.50.01 neither enumerates nor alludes to the elements of the offense, and it says nothing about the standard which the prosecution must meet in order for those elements to be proved. [¶] The jurors would have been required to look to other instructions—particularly CALJIC Nos. 2.90 and 10.41 (defining the elements of the offense under Pen. Code, § 288, subd. (a))—for that information, and we think it would be a gross underestimation of our fellow citizens to conclude they would not have done so. Since they were directed to consider all the instructions together, we doubt they would have disregarded the exacting language of CALJIC No. 2.90—emphasized during closing argument—which specifically identified the burden the prosecution was obliged to meet with regard to the elements of the charged offense. [¶] Rather, we are convinced the jurors would have realized that disposition evidence, while probative of defendant's guilt, must be assessed along with all the other evidence to determine whether every element of the offense was proven beyond a reasonable doubt. [Citation.] They need not have been legal scholars to do so. They knew Regalado was not charged with the five-year-old molestation. Reasonably intelligent people would—on the instructions given here—merely have put the prior offense into the deliberative mix as a factor to be considered. They would not have stopped after evaluating the prior and started signing verdict forms, as Regalado suggests. We therefore conclude that the wording of CALJIC No. 2.50.01 did not deprive Regalado of his right to due process." (*Regalado, supra,* 78 Cal.App.4th at pp. 1061-1063, italics omitted.)

---

a reasonable doubt] that [he] [she] committed the charged crime[s]. The weight and significance of the evidence, if any, are for you to decide."

Most recently, Division Three of this court expressed its disagreement with the analysis contained in *Waples, O'Neal, Regalado,* and *Van Winkle,* holding as follows: "[I]t is *not* proper to instruct the jury that if it finds the defendant committed other similar offenses it may infer he was disposed to commit *and did* commit the current offense. Such an instruction improperly permits a conviction based on the defendant's propensity. The jury must be reminded that propensity evidence alone cannot meet the prosecution's burden of proving the elements of the charged offense. Otherwise, the jury is prompted to use evidence of prior offenses in precisely the wrong way, as a substitute for proof of the current offense. [Citation.] [¶] Courts approving the use of former CALJIC No. 2.50.01 have reasoned the jury would avoid convicting the defendant solely on proof of his prior offenses by reading the instruction together with those on the necessity of proof beyond a reasonable doubt of each element of the charged offense. These courts were confident the jury would properly consider the prior crimes as only one factor contributing to an ultimate finding of guilt beyond a reasonable doubt. [Citations.] The Attorney General makes the same claim here. We cannot agree that the reasonable doubt instruction and the instruction enumerating the elements of the current offense cure the defect in the specific instruction governing other crimes evidence, even when, as in this case, the jury is further instructed to 'consider all the evidence' shortly after the invitation to infer guilt from propensity. [¶] We think it reasonably likely the jury harmonized the instructions on the burden of proof, the elements of the offense, the consideration of all evidence, and the inference of guilt from propensity by concluding [the defendant's] propensity was sufficient to establish the elements of the charged offense beyond a reasonable doubt, regardless of the strength or weakness of the other evidence. Three hundred years of jurisprudence recognizes juries are particularly susceptible to that suggestion. [Citation.] If the court seems to approve a faster and shorter path to conviction, which coincides with the natural inclination to assume guilt from propensity, it is unrealistic to believe the jury will correct the wrong turns in that path by reasoning from other, more general instructions. In a particular case it may be so unlikely the jury actually rested its verdict solely on the inference from propensity that we may deem the instructional error harmless. That, however, is a different question from whether the jury was correctly instructed on the law." (*James, supra,* 81 Cal.App.4th 1343, 1353-1354, italics added.)

■ Of course, the *James* court has identified a flaw in the language used in pre-1999 versions of CALJIC Nos. 2.50.01 and 2.50.02: "Other crimes evidence can support an inference of propensity, but propensity alone cannot support a conclusive inference that the defendant committed the charged offense." (*James, supra,* 81 Cal.App.4th 1343, 1354.) Thus, "[t]he jury must

be reminded that propensity evidence alone cannot meet the prosecution's burden of proving the elements of the charged offense. Otherwise, the jury is prompted to use evidence of prior offenses in precisely the wrong way, as a substitute for proof of the current offense. [Citation.]" (*Id.* at p. 1353.) Our Supreme Court, in *Falsetta*, voiced a similar concern, but expressed confidence that the 1999 amendments to those instructions have eliminated that flaw and will "assure that the defendant will be tried and convicted for his present, not his past, offenses."[9] (*Falsetta, supra,* 21 Cal.4th at p. 923.)

Nevertheless, as the *Regalado* court has explained, the flaw in the pre-1999 version of CALJIC No. 2.50.02 pales to utter insignificance when we consider the giving of that instruction in light of the jury instructions as a whole—as we must. (See *Regalado, supra,* 78 Cal.App.4th at pp. 1061-1062, citing, *People v. Price* (1991) 1 Cal.4th 324, 446 [3 Cal.Rptr.2d 106, 821 P.2d 610], and *People v. Garrison* (1989) 47 Cal.3d 746, 780 [254 Cal.Rptr. 257, 765 P.2d 419].) That is, viewing CALJIC No. 2.50.02 in the context of the entire body of proper instructions delivered to the jury in this case—including CALJIC Nos. 2.90 (requirement of proof beyond a reasonable doubt of each element of the offense), 8.20 (elements of first degree murder), and 2.27 (duty to consider all evidence upon which proof of a fact depends)—we are satisfied that there was no significant likelihood the jury would return a conviction based on evidence of uncharged acts of domestic violence alone.

Furthermore, as both the *Regalado* and the *James* courts noted, even if the giving of CALJIC No. 2.50.02 was erroneous, any error would be subject to scrutiny to determine if it was prejudicial in light of the strength of the evidence against the defendant. (*James, supra,* 81 Cal.App.4th 1343, 1360-1361; *Regalado, supra,* 78 Cal.App.4th at pp. 1063-1064, fn. 5.) Unfortunately, the recent case law is divided as to the proper standard of prejudice for such instructional error. In *James, supra,* 81 Cal.App.4th 1343, the court analyzed the issue thoroughly and concluded that any error should be evaluated for prejudice under the test announced in *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065], i.e., whether the error was harmless beyond a reasonable doubt. (*James, supra,* 81 Cal.App.4th 1343, 1361-1362); see also *Yates v. Evatt* (1991) 500 U.S. 391, 403 [111 S.Ct. 1884, 1893, 114 L.Ed.2d 432][an instructional error may be found to be harmless where it is shown beyond a reasonable doubt that the error was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record"].) The court in *Regalado* suggested that the proper test is that of *People v. Watson* (1956) 46 Cal.2d

[9]See footnote 7, *ante.*

818, 836 [299 P.2d 243], i.e., that any error in the giving of CALJIC No. 2.50.01 could be held harmless if there was no reasonable probability the error affected the result.[10] (*Regalado, supra,* 78 Cal.App.4th at pp. 1063-1064, fn. 5.)

We need not resolve the conflict in the case law to decide that, in this case, any error in the giving of CALJIC No. 2.50.02 was harmless beyond a reasonable doubt. There was no dispute whatsoever as to appellant's identity as the killer of his wife. Indeed, he admitted that he shot Patricia three times at close range and then, in the presence of his daughters, walked over and shot his wife a fourth time—in the head. Appellant's arguments to the contrary notwithstanding, the evidence of premeditation and deliberation was also exceptionally strong and clear. Appellant suspected his wife was having an affair and was planning to leave him. The day after Patricia told him one of them had to move out of the family home, he inquired about purchasing a .38-caliber handgun. Two days later, his "gun collector" friend delivered such a gun to appellant at his home. The following day, appellant went to Kmart and bought ammunition for the gun. After buying the gun and bullets, he at least twice threatened to kill Patricia. Then, whether the day before or the day of the barbecue, he loaded the gun and hid it in the garage—where it was ready for use when Patricia went in there to drive away after they argued on the night of the barbecue. Surely in these circumstances, even if the jury considered the 1992 incident and applied CALJIC No. 2.50.02, any inference the jury might have drawn was utterly "unimportant in relation to everything else the jury considered on the issue" of appellant's conduct and state of mind in the days before and at the time of the shooting. (*Yates v. Evatt, supra,* 500 U.S. 391, 403-404 [111 S.Ct. 1884, 1893] [an instructional error may be found to be harmless where it is shown beyond a reasonable doubt that the error was "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record"].) On the present record, we do not believe appellant has demonstrated prejudice from any error in the giving of CALJIC No. 2.50.02.

**B.** *The Trial Court Did Not Abuse Its Discretion by Allowing Hernandez to Testify About the Victim's Recent Statements Evidencing Her Fear of Appellant.*

Appellant next contends that the trial court erred by allowing Hernandez to testify on rebuttal regarding Patricia's statements about her desire to leave appellant, and his threats to kill her if she did. Appellant

---

[10]Appellant argues for a rule that any error in the giving of CALJIC No. 2.50.02 was structural and, therefore, reversible per se. None of the recent case law on this issue support appellant's position.

timely objected to this evidence as inadmissible hearsay.[11] Appellant's objection was properly overruled.

■ "The trial court is vested with broad discretion in determining the admissibility of evidence. [Citation.] This is particularly true where, as here, underlying that determination are questions of relevancy, the state of mind exception to the hearsay rule, and undue prejudice. [Citation.] The lower court's determination will be reversed only upon a finding of abuse. [Citation.]" (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 386 [44 Cal.Rptr.2d 914])

■ The state of mind exception to the hearsay rule is codified in section 1250, subdivision (a), which provides: "Subject to section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule." Under section 1252, a statement of the declarant's mental or physical condition is admissible unless the statement was made "under circumstances such as to indicate lack of trustworthiness."

In this case, it was plainly within the discretion of the trial court to admit Hernandez's testimony for the purpose of impeaching appellant's claims about Patricia's state of mind in the garage on the night she was killed. That is, appellant testified that Patricia fearlessly challenged him in the garage, kicked him in the testicles, and insulted him in a very provocative way. Hernandez's testimony evidence was admissible to the extent it was relevant to show Patricia's state of mind on the night of October 3, 1997, so long as her state of mind was "itself an issue in the action." (§ 1250, subd. (a)(1).) Appellant himself placed Patricia's state of mind in issue by presenting testimony and argument in support of a theory that the killing amounted to no more than voluntary manslaughter, i.e., that he killed Patricia while under the influence of a sudden quarrel or in the heat of passion and with sufficient provocation as would cause a reasonable person of average disposition to act rashly and without deliberation. Other witnesses testified that appellant had abused his wife in the past. Hernandez's account of Patricia's tearful statements evidenced her fear of appellant and tended to refute any suggestion that Patricia would have made the bold, insulting comments appellant claimed (for the first time at trial) she made as she was preparing to leave in her car after their argument. In short, Hernandez's testimony was made

---

[11]Appellant further contends that the evidence should have been excluded pursuant to section 352, because it had only minimal probative value and was unduly prejudicial insofar as it portrayed him as a violent individual. Because no objection was made in the trial court on this basis, the point is waived. (*People v. Armendariz* (1984) 37 Cal.3d 573, 588-589 [209 Cal.Rptr. 664, 693 P.2d 243].)

admissible under the terms of section 1250 and the trial court did not err in so concluding. (*People v. Ortiz, supra*, 38 Cal.App.4th at pp. 377, 389.)

Nor did the trial court err or abuse its discretion in concluding that Patricia's statement was not made "under circumstances such as to indicate its lack of trustworthiness." (§ 1252.) Nothing in the circumstances of Patricia's conversation with Hernandez suggests a motive to misrepresent or manufacture evidence. It was Hernandez, not Patricia, who asked for a ride home from work because she was feeling ill. The two women were friends who had worked together for 15 years. Hernandez asked why Patricia was crying, and inquired whether it had to do with appellant. Patricia explained that she wanted to leave appellant but was afraid to do so because of his threats. It is entirely reasonable to conclude that, in these circumstances, Patricia was confiding in her friend, and expressing her then-existing state of mind " ' "in a natural manner and not under circumstances of suspicion." ' " (See *People v. Pinn* (1971) 17 Cal.App.3d 99, 106 [94 Cal.Rptr. 741].) As in *People v. Thompson* (1988) 45 Cal.3d 86 [246 Cal.Rptr. 245, 753 P.2d 37], there was "no obvious reason for her to manufacture an expression of fear she did not feel." (*Id.* at p. 104.)

### III. CONCLUSION

For all the foregoing reasons, the judgment of conviction, including the sentence imposed by the trial court, is affirmed in its entirety.

Hanlon, P. J., and Poché, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 25, 2000.