Filed 5/30/14  P. v. Garcia CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE ANTONIO GARCIA,<br><br>    Defendant and Appellant. | G047694<br><br>(Super. Ct. No. 11ZF0115)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed.

Robison D. Harley, Jr., for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lise Jacobson and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Jose Antonio Garcia guilty of the second degree murder of his wife, Adriana.  The jury returned a true finding that defendant personally discharged a firearm within the meaning of Penal Code section 12022.53, subdivision (d) in murdering the victim.  (Unless otherwise indicated, all statutory references are to the Penal Code.)  The court sentenced defendant to state prison for 40 years to life.

On appeal, defendant contends the trial court abused its discretion in excluding evidence and in instructing the jury.  Finding no error, we affirm.

I

FACTS

*Months, Weeks and Days Prior to Murder*

According to a police officer, the previous June 19, 2010, defendant told officers "he had received an anonymous phone call stating that his wife might be seeing another man.  He got home from work and said that he — she and him had a conversation about their relationship and this accusation that she might be seeing another man."  Defendant admitted putting a pillow over his wife's head at that time, and that he prevented her from leaving when she attempted to leave.  After that, "the defendant had a restraining order against him."

Defendant telephoned Adriana "every five minutes."  At one point, Adriana moved into her brother and sister-in-law's home.  While staying there, defendant came to the home "screaming saying foul language."  After some period, Adriana moved back to her own home and lived with defendant, but there was an occasion where she came to her brother and sister-in-law's home with bruises.

Adriana's brother changed all the locks in her home several weeks prior to her murder.  Adriana did not give a key for the new locks to defendant.

After the restraining order was in effect, defendant lived with his brother.  Defendant's brother, told police he had installed a tracking device on Adriana's vehicle.

2

Defendant had told his brother he wanted him to install the device because he thought it might help in a subsequent divorce.

Adriana and another man had a romantic relationship between May 2010 and October 2010, when she was murdered. Defendant went to the man's work and asked him what he wanted with his wife. The man responded: "I told him I didn't want any problems and I was sorry and we'd just been friends." Defendant told the man, "the next time he came to my work he wouldn't just come to work." The man broke off his relationship with Adriana after that. Adriana and the man did not meet again until she invited him to an El Torito restaurant on the evening of October 15, 2010.

Three days prior to the murder, someone offered to sell defendant a gun for $350. Defendant negotiated the cost down to $180.

According to defendant's mother, defendant was crying on the evening of October 14, 2010, two nights before the murder. He said: "Look Ma, Ma, what I'm going to do is buy a gun, and I'm going to kill myself in front of Adriana." That was the first time he had ever made a claim that he was going to hurt himself or commit suicide. Defendant also talked about suicide to his brother.

The night before the murder, defendant went to a restaurant because he knew Adriana would be at an El Torito restaurant which was across the street. After the murder, defendant would tell the police he was going out for a drink and just happened to go there, but would tell a psychologist Adriana told him which restaurant she would be going to that evening.

*The Day of the Murder*

During the morning of October 16, 2010, defendant and his son, who was then 18, spoke on the telephone. The son, who lived with his mother, Adriana, and siblings in their home on Mohawk Drive in Santa Ana, told defendant his mother was home. Defendant said he wanted to meet with his son and the other children. Around

3

noon, after the other kids were up and dressed, the 18-year-old son again spoke with defendant and they planned to meet at "grandma's house." The children arrived at their grandmother's house on Sullivan Street at about 12:20 p.m., but defendant did not show up or call.

At about 12:25 p.m. Adriana was talking on the phone with her friend, when Adriana started to whisper. In a scared voice, she said, "Tony." Then the phone went silent.

In the early afternoon, police were dispatched to the Mohawk residence. There had been a report that some shots were fired and a dead woman was inside the house. They found Adriana's body partially on a bed and partially on a carpet, and a pillow "with all the blood" on it.

There was a gunshot wound on the back of the head. There was bruising along the neck, shoulder, chest, around the eyes, and left arm and knee. The bruising was consistent with recent blunt force trauma. It was later determined the cause of death was "cerebral edema due to the gunshot wound to the head."

At the scene, a pillow with a hole on one side and protruding stuffing on the other side was found. The investigating detective opined that the significance of the protruding stuffing was that "[a]s the bullet would pass through the pillow . . . if it were to exit, you usually take something with it."

Defendant was located in a truck at Centennial Park. With officers attempting to negotiate, he sat in the driver's seat with a gun for approximately two hours, and then placed the gun on the dashboard and came out of the truck and was taken into custody. Police seized the gun from the driver's side of the dashboard with a magazine that had a 10 round capacity inserted in it as well as a round in the chamber. Defendant handed police a note.

When he was later interviewed by the police, defendant said he entered the house through a window. She was in the bedroom, speaking to someone on a cell phone.

4

Adriana threw the cell phone at him. Defendant had a gun in his pocket. He took out the gun "[w]hen she started hitting me." Defendant explained what he was thinking when he pulled out the gun: "I wanted to kill myself right there, but I knew that [my son] and them were going to call back, come back, so I go, if they don't, if I don't go over there, they're gonna come back. So I called the police." When he was asked how many times he shot the gun, defendant responded: "Two." When he was asked where he shot her, he said: "I think in the head."

The following questions were asked by a detective and answered by defendant:

Q: "You wanted to shoot yourself."

A: ". . . myself. Yeah, but I said, [my son] is gonna come so I, I go before I'm going call the cops so they can come and make sure that they're here . . . ."

Q: "So . . . ."

A: ". . . so they won't let them in. And I go, I'm just gonna go and kill myself. And I was wait . . . I was waiting to get the, I then moved from right there, the truck was in the same spot since the morning."

*Defense Expert*

A clinical and forensic psychologist conducted a psychological evaluation of defendant, reviewed cell phone records and reviewed police reports. The doctor testified defendant "suffers from major depressive disorder, severe, and he also suffers from borderline intellectual functioning," and that a jail psychiatrist diagnosed defendant as having adjustment disorder. The doctor explained that borderline intellectual functioning "is a person who has an IQ between 71 and 84. So this is a person that would basically be considered borderline mentally retarded."

The doctor stated: "A major depressive disorder is a mood disorder where the person feels sad most of the time or has lost interest in measurable activities, and it's

5

accompanied by other symptoms such as insomnia, could be agitation, fatigue, either significant weight loss or weight gain, preoccupied with thoughts of death or suicidal ideation."

With regard to borderline intellectual functioning, the doctor explained: "When a person doesn't have adequate intellectual functioning it affects all areas of their lives. So for instance, a person can't communicate as well with other people. So they will become easily frustrated. They don't have the intellectual capacity to deal with stressors like other people — like normal people do, people functioning within the average range and above."

*Pretrial Motion*

Prior to trial, citing Evidence Code section 1250, subdivision (a) as well as to a nonhearsay purpose, defendant moved the court for admission of the note defendant gave to police, a three-page handwritten document which states: "My name is Jose Garcia A. I fund out that my wife Adriana Garcia was shidding on me from time to time and when I confronted her she put a restraining order on me for her and the kids too. Just last knigh I got her with a man I told her I would let it go if she would go away with the man and live me and the kids alone and she said she had everything her way she has my house money and I was out of the picture, and she didn't even need to take care of the kids. [Defendant's signature.] I keap asking her family to talk to her she was [unreadable word] home with the kids she was away on the street with her friends. This started since March of this year when . . . started puching my wife to do what she wanted her to do, and when I would call my wife that . . . lady would tell her dont anwer him be just like I do want ever I want with your brother . . . . [Defendant's signature.] No one knew I was going to do this it just happen so quickly give my parents our kids. [Defendant's signature.] 10/16/2010 By the way her sister in law . . . knew everything

6

that was going on again.  [Defendant's signature.]  I ask God for HLPH, and it was denied"  (Errors in original.)  The court denied the motion to admit the note.

II

DISCUSSION

*Defendant's Note*

Defendant's first contention is:  "The court abused its discretion by excluding any and all state of mind evidence about [defendant's] suicide note written at the time of the murder."  He claims defendant's "state of mind on the day of the murder was critical.  Was he depressed and suicidal or angry and homicidal?  Although [defendant's] suicide note never specifically mentions the word suicide, it certainly paints a vivid picture of a severely depressed person who suddenly found himself in a hopeless and helpless situation."  He also states the note supported his heat of passion defense.

"(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:  [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant.  [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."  (Evid. Code, § 1250.) "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."  (Evid. Code § 1252.) A trial court's evidentiary ruling is reviewed for abuse of discretion.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 821.)

In *People v. Ervine* (2009) 47 Cal.4th 745, defendant wrote five pages of notes after a shooting, which the court excluded, and which the California Supreme Court reviewed for abuse of the trial court's discretion, before concluding there was no abuse of

7

discretion. (*Id.* at p. 778.) The court analyzed as follows: "At the time defendant wrote these documents, he was trapped inside his house; personnel from the Lassen County Sheriff's Department and other law enforcement agencies were just outside. He was aware that his only options were surrender or suicide, and his statements focus largely on securing forgiveness." (*Id.* at p. 779.) The Supreme Court concluded "[t]here was thus ample ground to suspect his motives and sincerity when he wrote these self-serving documents." (*Ibid.*)

In the instant matter, the trial court here stated: "[T]here's no question this man was suicidal. He spent four hours with a gun to his head holding the police at bay while they negotiated him out of killing himself. . . . The suicide note — so-called suicide note doesn't say anything about suicide. The reason we know he was suicidal, he sat there with a gun to his head for four hours threatening to the police that he was going to kill himself. . . . The issue is whether he also wanted to and planned to take her with him."

The court carefully analyzed the situation and considered the probative and prejudicial value of the note before ruling, concluding the probative value was lacking. We cannot conclude the court abused its discretion or otherwise erred in excluding the note.

Additionally, the jury heard a lot about suicide. They heard all about the negotiations to get defendant out of his truck. Jurors saw the video of defendant telling police he wanted to kill himself during his police interview. There was also testimony from defendant's mother that he told her he wanted to kill himself. Defendant's brother told the jury defendant talked about suicide. Additionally, the defense psychologist testified that persons with defendant's condition are "preoccupied with thoughts of death or suicidal ideation." Under these circumstances, even if the court erred in excluding defendant's note, which we do not find, we cannot conclude that excluding admission of defendant's note made any difference in the jury's determination, and, in light of the state

8

of the evidence, we do conclude it was harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

*Evidence of Adriana's Lack of Fear*

Defendant next argues: "The court abused its discretion by refusing to admit evidence of the [Adriana's] lack of fear to support [defendant's] provocation defense and corroborate his confession to the police regarding [Adriana's] provocative conduct immediately preceding the homicide."

When defendant's son was testifying, defense counsel asked: "[D]id your mother ever express any concern about your father's violation of this restraining order?" The prosecutor objected on the basis of hearsay and relevance, and defense counsel said it was offered to show the nonhearsay purpose of absence of fear.

The court questioned defense counsel about the relevance of Adriana's state of mind, and counsel responded: "Well, the relationship between these two people is highly relevant. I mean, that's all we have. That's how we have heat of passion and sudden quarrel. And you have to consider the relationship between those two people. And I think this has a tendency in reason to prove the nature of the relationship. It's not a fear domination — fear-dominated relationship." The court sustained the prosecutor's objection on the ground of relevance.

In his brief, defendant expands his argument somewhat: "If the prosecution is entitled to elicit [Adriana's] statement of fear to refute a defendant's claim that [Adriana] fearlessly challenged him, assaulted him, and insulted him in a very provocative way to show sufficient provocation to reduce the killing from murder to voluntary manslaughter, it follows that [defendant] should have been permitted to show absence of fear to support his claim that his wife fearlessly attacked him in the bedroom in a sufficiently provocative way to reduce the killing on October 16, 2010 from murder to voluntary manslaughter."

9

To support his position, defendant cites *People v. Escobar* (2000) 82 Cal.App.4th 1085. In that case, the defendant testified his wife fearlessly challenged him and insulted him in a very provocative way to support his defense that he killed her in a heat of passion. (*Id.* at p. 1103.) After ruling the defendant had placed the victim's state of mind at issue, the prosecutor was permitted to present evidence the victim was afraid of the defendant. (*Ibid.*)

In *Escobar*, it was the defendant who offered evidence of lack of fear. In the instant matter, the evidence was elicited from Adriana's son, the very person a mother might go out of her way to shield from knowledge about her true feelings for his father. Under the circumstances we find in this record, we cannot conclude the court abused its discretion when it found the proposed testimony irrelevant. Additionally, Adriana's state of mind here was not in dispute.

Had the court erred in not permitting evidence of Adriana's lack of fear, and we do not make that finding, any error in excluding the evidence is harmless under any standard because there is overwhelming evidence here to support the jury's verdict. (*Chapman v. California, supra,* 386 U.S. at p. 24; *People v. Watson, supra,* 46 Cal.2d at p. 836.)


*CALCRIM No. 3428*

On appeal, defendant contends: "The court prejudicially erred in connection with [defendant's] mental impairment defense" by not instructing the jury with his preferred modified version of CALCRIM No. 3428.

Defendant claims he submitted a proposed instruction to the court, a modified version of CALCRIM No. 3428. The requested instruction is not contained in the record on appeal. However, the court did give the CALCRIM No. 3428 to the jury.

Counsel and the trial court discussed the issue many months after the verdict. The court stated: "One issue has to do with the requested or the possibility that

10

the defense requested specific jury instructions, and I had to ask counsel to look into their file to see if they had it." The prosecutor said he did not have a hard copy of that instruction in his file, but stated he remembered discussing it. The prosecutor added: "I remember what he asked. I think the record and the transcript is clear about that. I think what should go up to the Court of Appeal[] is the fact that that request was made for a full rendition of 3428."

CALCRIM, No. 3428, as actually given to the jury in this case, reads: "You have heard evidence that the defendant may have suffered from a mental defect or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state. If the People have not met this burden, you must find the defendant not guilty."

In his brief on appeal, defendant states he requested the court to give the following modified version of CALCRIM 3428: "You have heard evidence that the defendant may have suffered from a mental defect or disorder. You may consider this evidence only for the purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with premeditation, deliberation, and express malice aforethought in order to convict defendant of first degree murder under either theory. If the People have not met this burden, you must find defendant not guilty of first degree murder. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with malice aforethought, either express or implied, in order to convict defendant of any murder. [¶] If the People have not met this burden, you must find the defendant not guilty of murder."

11

When the proposed modified instruction was discussed during trial, the court stated: "I'm just concerned about a lengthy and confusing instruction on a fairly simple point. That's what we would be — that's what the court would created if it tried to set out each offense and each mental state separately, and that's why the court — I like this shorter version. There are other instructions that the court is proposing that are standard in the CALCRIM where the court refers the — refers the jury to the specific instructions on the crimes for the mental state. And I think that the jury, therefore, is completely capable of making that reference, and therefore, I'm not going to change 3428 to make it more detailed than it is right now."

The trial court has a duty to instruct the jury on general principles of law that are commonly or closely connected to the facts before the court and necessary for the jury's understanding of the case. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.) Here the court instructed the jury with CALCRIM Nos. 520 (First or Second Degree Murder with Malice Aforethought) and 521 (First Degree Murder).

In addition to giving CALCRIM No. 3428, the court instructed the jury with CALCRIM No. 520 on first or second degree murder with malice aforethought, CALCRIM No. 521 on first degree murder. Both of these instructions included the language in the modified jury instruction defendant claims he urged the court to give. When the modified instruction defendant offered was denied by the court, the court explained the language requested was included within other instructions, and adding the additional language would render the instructions lengthy and confusing.

A court is within its discretion in refusing to instruct a jury with a special instruction duplicative of other instructions given. (*People v. Jones* (2012) 54 Cal.4th 1, 74.) Under the circumstances we find in this record, we cannot conclude the court erred in refusing to give defendant's modified version of CALCRIM No. 3428.

12

III

DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.