121 Cal.Rptr.2d 289 (2002)
99 Cal.App.4th 546
The PEOPLE, Plaintiff and Respondent,
v.
Gary SIZEMORE, Defendant and Appellant.
No. B147365.
Court of Appeal, Second District, Division Seven.
June 20, 2002.
Review Granted September 18, 2002.
*291 Linda Starr, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert P. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Ana R. Duarte and Jim E. Hart, Deputy Attorneys General, for Plaintiff and Respondent.
*290 LILLIE, P.J.
A jury found defendant guilty of solicitation of Mark Tatum (Tatum) to commit the murder of Judith Sizemore (count 4; Pen. Code, § 653f, subd. (b)); defendant was sentenced to the upper term of nine years in state prison and ordered to pay a restitution fine. On appeal from the judgment, defendant claims error in admission of evidence and in instructing the jury; he also challenges the sufficiency of the evidence.

FACTS

A. Prosecution Case.
After about 18 years of marriage to defendant, a Los Angeles County Fire Captain, Judith Sizemore wanted a divorce from defendant because he had had several affairs with other women and had been involved in criminal activity. The couple had two sons; defendant earned about $7,000 per month. Judith Sizemore hired a divorce lawyer on March 21, 1996; her lawyer was seeking a "kick-out" order to get defendant out of their house immediately. In February 1996, she and defendant had an argument about the divorce; she socked defendant in the arm, and defendant slapped her face. About March 19 or 20, 1996, in another argument about the divorce, she threw water from a glass in defendant's face, and he grabbed her tightly by her arms and held her against the kitchen wall; the next day she had bruises on her arm.
On the morning of March 22, 1996, defendant followed his wife around the house, asking if she had hired a lawyer and if he would be served with papers; she told defendant to leave her alone; defendant grabbed her, put his arm around her neck and choked her; she stopped struggling when she started to black out; when she was on the ground, defendant let go of her neck and sat on her, yelling at her not to go to the police or her friends; he told her, "I don't want to have to kill you.... You don't want to become another Nicole Brown Simpson, do you?" After defendant got off of her, Judith Sizemore got up and acted like nothing had happened; she *292 got her younger child and drove to the hospital; she sustained broken blood vessels in her eye, bruises all over her legs, and she could not talk very well. Later that day, her lawyer got a "kick-out" order and restraining order against defendant. She also made a police report of the assault, which resulted in defendant's arrest. The couple's divorce proceedings, during which both were represented by attorneys, lasted from March 1996 to December 14, 1998, when a final settlement was entered. On October 1, 1998, the parties had reached a settlement whereby Judith Sizemore received spousal support of $1,000 per month, child support of $825 per month per child, attorney's fees, and the couple's home and contents, provided she pay defendant $24,000. She also received half of defendant's retirement funds.
In November 1997, defendant refused to endorse an insurance check issued for damage to their house, so on February 11, 1998, the superior court ordered the court clerk to sign the checks; Judith Sizemore got all the insurance proceeds and defendant got nothing.
On February 17, 1998, Eligio Gonzalez (Gonzalez) was working at a florist shop; at that time he was on probation for a 1994 second degree burglary conviction; his manager at the shop, Peggy, had introduced him to defendant, whom he had seen on three previous occasions; Gonzalez saw defendant walk by the back of the shop and call to him; Gonzalez went outside to talk to defendant who looked like he had not shaved for some days; defendant was fidgeting with a notebook and looking off to the side. Defendant offered Gonzalez a job; Gonzalez asked what type of job; defendant asked him if he wanted to kill someone. Gonzalez was surprised; to be certain he asked again and defendant again asked if he (Gonzalez) wanted to kill someone. When the owner of a neighboring shop walked by, defendant became nervous and left. Gonzalez told his manager about the incident and his manager told the owner of the shop; the next day, Gonzalez went to the police station in Pomona and told Detective Raul Camargo of the incident. According to Detective Camargo, Gonzalez described the person who approached him as Gary, a fire captain in Pasadena. Gonzalez did not know Judith Sizemore, Tatum, or Alison Oliver (Oliver).
Defendant admitted that in February 1998, Peggy was his girlfriend; in February 1998, after Gonzalez's complaint, a police officer came to Peggy's house and talked to defendant; the officer told defendant that if anything happened to his wife, defendant would be a suspect. Sometime in 1998, Gonzalez violated his probation by leaving the state for Utah; the prosecution obtained an order bringing Gonzalez to California to testify at defendant's trial in November 2000; no offers were made to Gonzalez by the prosecution regarding his testimony.[1]
According to Oliver, she met defendant in late July 1998 at a Ralph's supermarket in Pasadena where she was working; she and defendant had a sexual relationship that lasted from August to October 1998. During that time, defendant was angry and hateful towards his wife; he told Oliver that he had no money because he was always giving it to his ex-wife and children. In September 1998, defendant asked her *293 to go to the Auto Club, where Judith Sizemore worked, to see if a bomb could be placed under Judith Sizemore's desk. Defendant asked her if she knew any "hit men" that would take care of his wife; she told him no, but one time she lied to him and told him she may know someone, in order to get him off her back.
About a week after Oliver went to the Auto Club, defendant and Oliver went up to Angeles National Forest to experiment with a bomb defendant had made; defendant attempted to detonate a bomb with wires and a battery, but nothing happened. A few days later, they returned to the same place and defendant detonated a bomb in a black backpack near a cement water tank, blowing off a chunk of cement from the cement pillar of the tank; the black backpack was shredded; defendant threw pieces of the backpack and a paper bag over the side of the hill. A few days after the second trip to the forest, defendant asked her to help take care of his wife, saying that she "needed to die."
In early October, defendant took Oliver to the Auto Club to show her his wife's walking route at lunch time; defendant wanted Oliver to hide a backpack containing a bomb by a tree on his wife's route; Oliver could detonate the bomb from across the street using a remote control. Oliver told defendant she would not do it. According to Oliver, defendant brought another bomb in blue backpack to her work and put in the trunk of her car because defendant had to go to a class and he did not want to keep the bomb in his car; Oliver took the backpack home and put in her bedroom closet; she was nervous about it and defendant came and retrieved the backpack after his class. Oliver split up with defendant a week before Halloween in October; she saw a side to defendant that she did not like.
Oliver did not hear from defendant until December 24, 1998; defendant called her at work and insisted that she come to his fire station on her way home; defendant met Oliver at her car; he was nervous and told her he had asked a relative to help him kill his ex-wife; the relative had gone to the police. According to Oliver, she did not go to the police because she did not want to get involved. The police, however, found Oliver in August 1999; Oliver was at first not completely cooperative and did not tell the police about the bomb going off in the forest until after a prior court proceeding. Oliver did not know Tatum or Gonzalez.
Oliver admitted being involved in several felonies, but the prosecutor had made no promises to her. Detective Cofield testified that in his opinion, two pipe bombs, both in the black backpack, had blown up at the site near the water tank.[2]
Tatum, defendant's cousin, lived in Glendora in a two bedroom apartment with his wife Diane Tatum (Diane) and four children; Tatum had not seen defendant in about 15 years; however, Tatum would occasionally see defendant's father, Clyde Sizemore, known as "Pepper," at the house of Tatum's grandmother, Pearl. Neither Tatum nor Diane knew Judy Sizemore, Oliver, or Gonzalez. In 1996, Tatum had been arrested for driving a car that had some stolen property in it; before 1996, he also was a drug user; after his arrest, he stopped using drugs. Tatum and Diane Tatum had declared bankruptcy a few years before 1998.
*294 On November 2, 1998, defendant telephoned Diane at her work; Diane had never met defendant; defendant said he was trying to get a message to Tatum; defendant gave her his telephone number. Later that evening, Diane called the number given to her by defendant and handed her cell phone to Tatum, who left a message on an answering machine, which message included Diane's cell phone number. Diane then called Pearl, got the number for defendant's father Pepper, and called Pepper's home in Arcadia at about 6:53 p.m., as reflected on Diane's telephone bill. Pepper answered the telephone and got defendant; defendant asked to come to Tatum's house; Tatum refused; defendant then said he wanted to meet him and would get in touch with him. At about 7:32 p.m., according to Diane's cell phone records, Tatum received a telephone call from defendant from a pay telephone at the Sports Chalet in Glendora; defendant told Tatum that he (defendant) was calling from the Sports Chalet and wanted to come to Tatum's house; the Sports Chalet was about three-quarters of a mile from the Tatum's house and about 13 miles from Pepper's house. The distance from Pepper's house to the Sports Chalet could be driven in 16 minutes. Tatum suggested meeting defendant at a Ralph's market about three blocks from Tatum's house.
As Tatum was walking up to the market, defendant came running out and asked Tatum to do a favor for him; Tatum asked what it was, and defendant told him he wanted Tatum to take care of his wife; Tatum asked defendant what he meant, and defendant said to get rid of her; Tatum said, "You mean kill her?" and then, "You ain't got enough fucking money." Defendant said he would give Tatum $30,000. In shock, Tatum said, "Don't call me, I'll call you."
According to Diane, Tatum was gone about seven or eight minutes; when Tatum returned home, he appeared to Diane to be very pale and upset. Tatum told Diane what had happened with defendant. Diane telephoned Wendy Tatum, her best friend who is also a cousin of Tatum and defendant. The next day, Tatum told Lieutenant Timothy Dech of the Glendora Police Department what had happened with defendant. According to Tatum, when he was shown Dech's police report several months later, Tatum told Dech that the report incorrectly stated that he, Tatum, offered defendant $30,000, when defendant was the one who had offered him $30,000. Dech felt his original report correctly stated what Tatum had told him.
On November 3, Diane talked with Pepper and told him that Tatum had spoken to the police. A couple of hours later, Pepper came to their house and wanted to talk to them; Tatum refused to talk to Pepper.
Judy Sizemore testified that she did not know Oliver, Gonzalez, or Tatum, but she knew Tatum was defendant's cousin. Defendant was arrested in April 1999.

B. Defense.
As to the offense of soliciting Tatum to commit murder, defendant presented an alibi defense. Defendant testified that on the evening of November 2, 1998, he was working on a car at his parents' house at 7 p.m.; about 8 p.m., he went inside and did crossword puzzles with his mother in the living room. Defendant admitted that while he was working on his car, Tatum telephoned him and asked to meet him to talk about defendant's divorce; defendant said he was not interested; Tatum said that defendant could pay him now or pay him later; defendant refused to meet Tatum and Tatum hung up on him. Defendant testified that although Tatum's telephone call upset him and brought back *295 memories of the Gonzalez incident, he did not inform the police about Tatum's call. According to defendant, he saw other people, including Enrique and Gerardo Hernandez, at Pepper's home on the evening of November 2; he did not previously mention the Hernandezes being there because he only remembered them after the last court proceeding.
The Hernandezes testified that they went to Pepper's house about 7 p.m. a couple of days after Halloween in 1998; defendant was there working on his car and then came into the house to play cards with his mother; defendant was there when they left about 9 p.m. Both defendant's mother, Magdalena Sizemore, and Pepper also testified that defendant was at their home on the evening of November 2. Magdalena Sizemore admitted that in May 1999, she did not tell a probation officer that defendant was home all night on November 2,1998.
Defendant admitted that later in the evening on November 2, 1998, he heard from his father that Tatum was threatening to go to the police; defendant also admitted that he knew where the Sports Chalet was in Glendora as he had worked at the Glendora fire station in 1996.
Defendant testified that he never physically abused his wife; on March 22, 1996, Judy Sizemore was the one who started yelling at him for not going to work because of laryngitis; she first started pounding on his shoulder where he had had surgery; when she kept hitting him, he grabbed her by the shirt collar; she fell down and he rolled on top of her; he eventually got up after she calmed down; he denied threatening to kill his wife or mentioning Nicole Brown Simpson; he denied that his wife left the house that day with any injuries. Although they had developed a lot of animosity during the divorce, defendant denied asking Gonzalez, Oliver, or Tatum to kill his wife. He denied talking to Gonzalez on February 17, 1998, and never even heard Gonzalez speak English. Defendant also denied telephoning Diane Tatum or Tatum on November 2, 1998, although he did telephone his cousin, Wendy Tatum.
Defendant also denied making any bombs or going to the Angeles National Forest; he met Oliver in July 1998 while he was shopping at the Ralph's supermarket; he denied having sex with Oliver; he felt uncomfortable when Oliver sent him a sexually explicit letter on August 2, 1998; he was not looking for a romantic relationship with her. A few weeks later, Oliver called him and asked if he had been avoiding her, which he denied; Oliver then asked him if he remembered a fire fighter named Steve Dechellis; defendant last saw Dechellis in 1990 and at first did not remember him; Oliver recalled an incident that defendant had forgotten; in 1990, defendant had reported Dechellis, who was in uniform, for getting into a heated argument using profanities with a woman in a supermarket parking lot; defendant did not know then that the woman had been Oliver; Oliver accused defendant of ruining her relationship with Dechellis. After this conversation about Dechellis, defendant avoided Oliver; the last contact he had with Oliver was December 24, 1998; Oliver called him at work and asked if she could come to the fire station; he said no.

C. Rebuttal.
Diane Tatum testified that after Tatum returned to their house on the evening of November 2, 1998, she called Wendy Tatum and told her what had happened with defendant. The next day Diane went to the house of Tatum's grandmother, Pearl; Pearl told her that she needed to talk to Pepper. Diane telephoned Pepper, who wanted to explain why defendant would *296 feel compelled to do such a thing. Diane told Pepper that she did not really care; Pepper told her that defendant was going to lose his pension, was paying money in child support, and was going to lose his job over this. She told Pepper that Tatum had already gone to the police. Later that day, Pepper came to their house and said he wanted to explain to Tatum why this is happening; Tatum told Pepper he did not want to talk to him, so Pepper left.

I

ADMISSION OF EVIDENCE OF PRIOR ACTS
Appellant challenges the admission of evidence of his prior acts of domestic violence against Judith Sizemore and the admission of evidence of his solicitation of Gonzalez as prejudicial error in violation of his constitutional right to due process.
Prior to trial, the prosecution filed a motion to admit evidence of the prior acts of domestic violence and also sought a hearing on the admission of the uncharged solicitation of Gonzalez, contending the evidence was admissible pursuant to Evidence Code sections 1101, subdivision (b), and/or section 1109, and was more probative than prejudicial. Defense counsel objected to the evidence as irrelevant and as more prejudicial than probative under Evidence Code section 352. After an Evidence Code section 402 hearing, the court ruled the above evidence admissible. The court found the 1996 domestic violence incidents to be relevant under both Evidence Code section 1101 and section 1109, stating the evidence showed "an ongoing and continuous course" of conduct, and that the presentation of evidence would be "short and sweet." With respect to the Gonzalez solicitation, the court found that such evidence was admissible to show corroboration and motive.[3]
In People v. Falsetta (1999) 21 Cal.4th 903, 89 Cal.Rptr.2d 847, 986 P.2d 182 "the court considered a due process challenge to [Evidence Code] section 1108, a provision similar to section 1109 in that it permits the admission of a defendant's other sex crimes for the purpose of showing a propensity to commit those crimes.... [¶] Admission of evidence of prior acts of domestic violence under section 1109 is similarly subject to the limitations of section 352." (People v. Escobar (2000) 82 Cal. App.4th 1085, 1095, 98 Cal.Rptr.2d 696.) "A careful weighing of prejudice against probative value under [Evidence Code section 352] is essential to protect a defendant's due process right to a fundamentally fair trial." (People v. Jennings (2000) 81 Cal.App.4th 1301, 1314, 97 Cal.Rptr.2d 727; People v. Hoover (2000) 77 Cal. App.4th 1020, 1029, 92 Cal.Rptr.2d 208; People v. Brown (2000) 77 Cal.App.4th 1324, 1334, 92 Cal.Rptr.2d 433.)
Appellant seeks to have us review the trial court's evidentiary rulings under a de novo standard of review, although he acknowledges that the abuse of discretion standard is the usual standard of review of Evidence Code section 352 rulings. Appellant urges us to apply the de novo *297 standard of review as adopted by the court in People v. Cromer (2001) 24 Cal.4th 889, 103 Cal.Rptr.2d 23, 15 P.3d 243, involving review of a trial court's determination of the prosecution's due diligence in locating an absent witness to justify an exception to the defendant's right of confrontation at trial. As pointed out by respondent, Cromer is inapposite as it did not involve review of a ruling under Evidence Code sections 1101 or 1109. Moreover, since Falsetto, courts of appeal have continued to apply the abuse of discretion standard when determining whether evidence was properly admitted under section 1109. (See e.g., People v. Jennings, supra, 81 Cal.App.4th at p. 1314, 97 Cal.Rptr.2d 727 ["weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules"].) We will thus review the instant evidentiary rulings for abuse of discretion.
Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. (People v. Brown, supra, 77 Cal.App.4th at p. 1337, 92 Cal. Rptr.2d 433.) The trial court's exercise of such discretion will not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (Ibid.) The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. (People v. Poplar (1999) 70 Cal.App.4th 1129, 1138, 83 Cal.Rptr.2d 320.)
Appellant contends that the prior acts evidence here was highly inflammatory, consumed an undue amount of time, and had little relevance to the charges on which he was being tried. As to the March 1996 domestic violence evidence, we conclude that the probative value of the evidence was not substantially outweighed by the danger of undue prejudice. There was no risk of jury confusion, the acts were not remote in time, and the presentation of the evidence (through the testimony of Judith Sizemore and appellant) did not consume a disproportionate amount of time at trial. Evidence that appellant choked his wife is no stronger and no more inflammatory than the testimony concerning the charged offenses that he asked others to kill his wife. (See, e.g., People v. Brown, supra, 77 Cal.App.4th at p. 1338, 92 Cal.Rptr.2d 433; People v. Harris (1998) 60 Cal.App.4th 727, 737-738, 70 Cal. Rptr.2d 689.) Moreover, the domestic violence evidence was highly probative on the issues of appellant's intent and motive as to the charged offenses. "Where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etcetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a `distinctive modus operandi' analysis of other factors." (People v. Hoover, supra, 77 Cal.App.4th at p. 1026, 92 Cal.Rptr.2d 208; internal quotation marks omitted.) For all of the foregoing reasons, we conclude that the trial court correctly deemed the domestic violence evidence to be highly probative and without a unique tendency to provoke an emotional bias against appellant, so it was properly admitted under Evidence Code section 352.
*298 With respect to the uncharged solicitation of Gonzalez, appellant contends that the evidence consumed an undue amount of time and Gonzalez's vague testimony that appellant asked him to kill some unnamed person differed significantly from the specific allegations made by Tatum, and was highly prejudicial. However, the evidence was highly probative on the issues of motive, intent, common plan or scheme, and provided corroborative evidence as to the charged solicitation offenses. In light of the more than 1,600 pages of reporter's transcripts, and a trial continuing over the course of about two weeks, the 41 pages of Gonzalez's testimony was not disproportionate to the length of the trial and was unlikely to confuse the jury or evoke an emotional bias against appellant.
Appellant fails to establish that the trial court abused its discretion under Evidence Code section 352 in admitting the prior acts evidence. Accordingly, he also fails to establish the admission of such evidence violated his constitutional rights to due process. Because we find no error, we need not address respondent's contentions of waiver.

II

INSTRUCTIONAL ERROR
Appellant contends the court committed prejudicial error in giving jury instructions which permitted the jury to find him guilty by proof less than beyond a reasonable doubt.
After Judith Sizemore testified about the prior acts of domestic violence, the jury was instructed as follows: "Evidence is being introduced for the purpose of showing that the defendant engaged in an offense involving domestic violence on one or more occasions other than what is charged in this case. If you find that the defendant committed a prior offense involving domestic violence, you may but are not required to infer that the defendant had a disposition to commit other offenses involving domestic violence. If you find that the defendant had this disposition, you may but are not required to infer that he was more likely to commit and did commit the crime or crimes of which he is accused. However if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses. The weight and significance, if any, are for you to decide. Unless you are otherwise instructed, you must not consider this evidence for any other purpose."
The set of pre-deliberation instructions to the jury included the 1999 version of CALJIC No. 2.50.02. Appellant challenges the constitutionality of the latter instruction as used to instruct the jury in this case. He argues that because the instruction told the jury that prior domestic violence proved by a preponderance of the evidence cannot by itself prove the charged offense beyond a reasonable doubt, the instruction implied that when prior domestic violence is proved beyond a reasonable doubt, such evidence can itself prove the charged offense beyond a reasonable doubt. In other words, appellant argues that the instruction authorized the jury to find him guilty of the charged crimes solely on the basis of his propensity toward domestic violence so long as the prior acts of domestic violence were proved beyond a reasonable doubt.
Appellant also contends that CALJIC No. 2.50.02 implies that the prosecution can meet its burden with prior domestic violence proved by a preponderance of the evidence, in conjunction with other circumstances proved only by a preponderance of *299 the evidence, thus conflicting with well-established rules enunciated in CALJIC No. 2.01.
Although we are not aware of any reported opinion discussing this issue, we agree with appellant that the placement of the phrase "by a preponderance of the evidence" in CALJIC No. 2.50.02 creates an ambiguity and an inconsistency with the other instructions. Telling a jury prior domestic violence proved by a preponderance of the evidence is not sufficient to prove the present offense beyond a reasonable doubt implies by way of a negative pregnant that prior domestic violence proved beyond a reasonable doubt is indeed sufficient to prove the present offense beyond a reasonable doubt. Thus, a jury reading this paragraph could reasonably interpret the language to permit it to find the defendant guilty of the charged offense based on prior acts if the prior acts of domestic violence are proved beyond a reasonable doubt.[4]
The current version of CALJIC No. 2.50.02 thus carries a negative pregnant which was not borne by the propensity instructions in the cases cited by respondent. For example, in People v. Brown (2000) 77 Cal.App.4th 1324, 92 Cal.Rptr.2d 433, the instruction did not contain the negative pregnant in the instant instruction; the jury was instructed, pursuant to the revised 1999 version of CALJIC No. *300 2.50.02, that propensity evidence "is not sufficient by itself to prove that he committed the charged offenses." (Id. at p. 1334, 92 Cal.Rptr.2d 433; see also People v. Hill (2001) 86 Cal.App.4th 273, 278-279, 103 Cal.Rptr.2d 127 [similar language in revised 1999 version of CALJIC No. 2.50.01]; People v. Escobar (2000) 82 Cal. App.4th 1085, 1097-1102, 98 Cal.Rptr.2d 696 [1997 version of CALJIC No. 2.50.02].)
Under the circumstances of this case, a due process defect in the use of the latest version of CALJIC NO. 2.50.02 does not compel reversal, as the nonpropensity evidence of guilt was overwhelming.
"The United States Supreme Court has repeatedly held that the Chapman test may be applied to verdicts rendered by juries instructed on mandatory presumptions violating the defendant's right to proof beyond a reasonable doubt of each element of the charged offense. [Citations.] We see no reason for different treatment of instructional error involving a permissive inference." (People v. James (2000) 81 Cal.App.4th 1343, 1361-1362, 96 Cal.Rptr.2d 823.) The question is whether, independently of the permissive inference, the jury actually rested its verdict on evidence establishing guilt beyond a reasonable doubt. (Id., at p. 1363, 96 Cal. Rptr.2d 823.) "Because the inference before us was permissive, however, we may conclude the error did not contribute to the verdict either if the evidence is so strong that the effect of the inference from propensity alone is insignificant, or if the evidence is such that we are convinced beyond any reasonable doubt the jury did not actually draw the improper inference." (Ibid.)
In this case, the jury was instructed with the 1997 revision of CALJIC No. 6.35. Thus, in order to find Sizemore guilty of solicitation to commit murder, the jury was required to find guilt by the direct testimony of two witnesses or by the direct testimony of one witness and corroborating circumstances which "tend to connect the defendant with the commission of the charged solicitation of murder." (CALJIC No. 6.35.) In light of the nature of this offense and the whole body of instructions given, we are convinced beyond a reasonable doubt that the jury did not infer Sizemore's guilt solely from the propensity evidence without considering the strength or weakness of the charged offense of solicitation. (See, e.g., People v. James, supra, 81 Cal.App.4th 1343, 1364, 96 Cal.Rptr.2d 823.) The fact that the jury could not reach a verdict and hung as to the count involving solicitation of Oliver, (as to which there was weak, if any, corroborating evidence), but convicted appellant on the count involving the solicitation of Tatum (as to which there was strong corroborating evidence by testimony of Diane Tatum and Oliver), demonstrates that the jury did not consider the propensity evidence in reaching its verdict of guilt beyond a reasonable doubt on the Tatum count of solicitation. On the instant record, there was also such overwhelming evidence of guilt independent of the propensity evidence that the effect of the inference from such evidence alone was insignificant. Accordingly, we conclude that the error in the instruction did not contribute to the verdict and was thus harmless.

III

SUFFICIENCY OF EVIDENCE OF CORROBORATION
Without merit is appellant's contention that there was insufficient evidence of corroboration of Tatum's testimony regarding the solicitation. Diane Tatum and Oliver both provided corroborating evidence connecting appellant with the crime of solicitation, which corroborating evidence *301 created more than a suspicion of guilt and was independent of Tatum's testimony.
Diane Tatum testified that defendant contacted Tatum and met with him, which meeting left Tatum pale and upset; she also testified that Pepper told her that he wanted to explain why his son would do such a thing and that his son would lose his job over the incident. Oliver testified that appellant told her in December 1998 that he had asked a relative to help him kill his ex-wife, and the relative had gone to the police. Either of the foregoing incidents would have been sufficient to corroborate Tatum's testimony.
Appellant cites no authority to support his argument that because the jury did not convict on the solicitation count involving Oliver, they rejected her testimony out of hand, and Oliver's testimony thus cannot provide corroborating evidence. Here, the jury (which hung nine to three) reasonably could have credited Oliver's testimony of appellant's statement to her in December 1998 and properly could have considered the testimony to be sufficient corroborating evidence on the count involving Tatum; yet some members of the jury nevertheless could have been unable to convict on the count charging appellant with solicitation of Oliver to commit murder because they did not find sufficient corroborating evidence as to the Oliver solicitation. Appellant fails to establish the evidence is insufficient to support the judgment.

DISPOSITION
The judgment is affirmed.
We concur: JOHNSON and PERLUSS, JJ.
NOTES
[1] Defendant was not charged with the alleged Gonzalez solicitation, which was offered by the prosecution as corroborating evidence with respect to two other incidents of solicitation with which defendant was charged. In count 1, defendant was charged with soliciting Oliver to commit the murder of Judith Sizemore; in count 4, defendant was charged with soliciting his cousin, Tatum, to commit the murder of Judith Sizemore. There was a hung jury as to count 1 involving Oliver, which count was subsequently dismissed.
[2] In counts 2 and 3, defendant was charged with possession of a destructive device and possession of a destructive device on a public street or highway or other public place. (Pen.Code, §§ 12303 and 12303.2.) The jury hung on these counts, which were later dismissed.
[3] In his opening brief, appellant argues that "regardless of whether the testimony was properly admitted under Evidence Code §§ 1101, subdivision (b) or 1109, the trial court erred in admitting the evidence of prior acts by appellant because the prejudicial value of the prior acts far outweighed any probative value of the evidence." Although in the trial court the defense made legal arguments challenging the applicability of section 1109 to the instant prior acts, his appellate briefs do not raise this issue and appellant seeks to have the admission of all prior acts evaluated under the same set of legal principles. Accordingly, we need not address any distinctions between the cited Evidence Code provisions in relation to the prior acts at issue here.
[4] In People v. Reliford, Division Four of our District concluded the 1999 revision was insufficient to clarify for the jury how to reconcile the lesser standard of proof to establish the inference of propensity with the requirement of finding guilt beyond a reasonable doubt. The Supreme Court has granted review in Reliford. (People v. Reliford (B141201), review granted February 13, 2002 (S103084)).

In our view, the phrase "by a preponderance of the evidence" is misplaced in CALJIC No. 2.50.02. The phrase does not belong in the paragraph in which it appears, but more properly in a previous paragraph or in a separate instruction. For example, a sentence regarding the preponderance standard of proof may be able to be added to the end of the first paragraph of the instruction. Or, the issue can be addressed in a separate instruction, similar to CALJIC No. 2.50.1.
It should be remembered that whether proved by preponderance or beyond a reasonable doubt, propensity evidence is nevertheless only circumstantial evidence as to the charged crime. (See People v. Falsetto., supra, 21 Cal.4th at p. 915, 89 Cal.Rptr.2d 847, 986 P.2d 182.) However, there is language in the CALJIC No. 2.50.02 which permits jury to infer from the defendant's disposition "to commit the same or similar type offense," that the defendant was not only likely to commit, but "did commit, the crime of which he is accused." Thus, the jury here was told that it may infer from propensity evidence that the defendant did in fact commit the charged crime. Most juries probably would construe the permissive inference that the defendant "did commit" the charged crime as a permissive inference of guilt (beyond a reasonable doubt) as to the charged crime. This inference of guilt, however, does not appear to be permitted by the cautionary paragraph added in 1999, which tells the jury that a prior crime or crimes involving domestic violence is not sufficient by itself to find beyond a reasonable doubt that he committed the charged offense.
The pre-1999 version of CALJIC No. 2.50.02 did not contain the following cautionary paragraph, which was added in the 1999 version of the instruction and used in this case: "However, if you find [by a preponderance of the evidence] that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove [beyond a reasonable doubt that he] committed the charged offense. The weight and significance, if any, are for you to decide." (See People v. Younger (2000) 84 Cal. App.4th 1360. 1380, fn. 2, 101 Cal.Rptr.2d 624.)
There is a split of authority as to whether the pre 1999 version of CALJIC No. 2.50.02 violates due process by permitting a conviction based on proof less than beyond a reasonable doubt. (See People v. Hill (2001) 86 Cal.App.4th 273, 276-277, 103 Cal.Rptr.2d 127.)