Filed 5/21/14  P. v. Acosta CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038983 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F22119) |
| v. | |
| ANDY ALLEN ACOSTA, | |
| Defendant and Appellant. | |

## I. INTRODUCTION

Defendant Andy Allen Acosta appeals after a jury convicted him of inflicting corporal injury on the mother of his child (Pen. Code, § 273.5, subd. (a)[1]), false imprisonment by violence (§ 236), criminal threats (§ 422), misdemeanor vandalism (§ 594, subd. (a)), misdemeanor battery on the mother of his child (§ 243, subd. (e)(1)), and three counts of misdemeanor violation of a protective order (§ 166, subd. (c)(1)). Defendant was sentenced to a five-year, eight-month prison term.

On appeal, defendant contends he received ineffective assistance of counsel because his trial attorney did not object when the trial court admitted evidence, pursuant to Evidence Code section 1109, that defendant committed a prior domestic violence

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

offense more than 10 years before the charged offenses. Defendant also contends that his constitutional right to due process was violated when the trial court admitted evidence of two prior domestic violence offenses pursuant to Evidence Code section 1109. Additionally, defendant contends—and the Attorney General concedes—that the trial court erred by ordering him to pay a $200 fee to a women's shelter and a $200 domestic violence fund fee.[2] We will strike the two challenged fees and affirm the judgment as modified.

## II.    BACKGROUND

G.M. had an "on and off" relationship with defendant for about 10 years. They began dating in 2002, had two children together, and broke up in 2010. Although defendant moved out after they broke up, they still had sex "at times." They frequently argued about defendant's failure to help pay for childcare and about defendant's desire to "make things work."

### A.    March 5, 2011 Incident (Battery and Contempt)

A three-year restraining order issued on August 1, 2008 required defendant to stay 100 yards away from G.M. and to have no contact with her.

On March 5, 2011, G.M. was at her apartment with defendant and their infant daughter. Defendant wanted to have sex. G.M. said she did not want to. Defendant became angry. G.M. and defendant eventually went to bed together. At some point, defendant woke up G.M.. He hit her on the head and asked about a photo of man he had found on her cell phone. G.M. said the man in the photo was a friend, but defendant did not believe her. He hit her on the head, pulled her hair, called her a whore, and spit on her. Defendant also broke the headboard of the bed. He left the bedroom, but came back to hit G.M. and spit on her multiple times.

---

[2] Defendant also initially argued that the trial court erred by ordering him to pay a $190 lab analysis fee and a $190 AIDS fund fee, but he later withdrew that argument.

On March 9, 2011, G.M. filed a report with the Sheriff's Department. A deputy called defendant, who admitted that he had yelled at G.M. after finding a photo of another man on her cell phone. Defendant admitted spitting on G.M., but he claimed it happened unintentionally while he was yelling.

**B.** *January 24, 2012 Incident (Penetration With a Foreign Object, Infliction of Corporal Injury, False Imprisonment, and Vandalism)*

On January 24, 2012, G.M. stayed home from work because she had the stomach flu. Defendant called and asked why she was not at work; she told him that she was sick. Defendant later came to her apartment, bringing her Sprite and orange juice. G.M. thanked defendant, who wanted to come in. G.M. said she was not feeling well, but defendant pushed his way inside. G.M. told defendant she wanted him to leave. Instead, he picked her up and carried her to the bedroom, ignoring her pleas to put her down and leave. Defendant put G.M. on the bed and laid on top of her. G.M. tried to push him off.

Eventually, defendant lay next to G.M. on the bed. G.M. asked him to leave. Instead, defendant put his hand down her pants. G.M. told defendant to stop and tried to pull his hand out. Defendant put his hand inside G.M.'s underwear and tried to arouse her by putting his finger inside her vagina. G.M. told defendant to stop and asked him to leave. Defendant took his hand out, got on top of G.M., and asked if she was "fucking someone else." Defendant grabbed G.M. by the arms and shook her as he yelled at her, leaving marks and bruises on her arm. Defendant also punched a hole in the wall above G.M.'s head. The bruises on G.M.'s arm were later observed by a deputy and a Sexual Assault Forensic Examiner nurse.

The next day, defendant left G.M. several voicemail messages. In one message, defendant stated, "I'm gonna get you and I'm gonna fucking beat the living shit out of you just for that, watch. 'Cause I know you were fucking somebody, huh, you fucking little bitch. You watch. I'm gonna fuck you up and kill you, bitch." The voicemail messages were played for the jury.

3

G.M. filed a report with the Sheriff's Department. A deputy helped her perform a pretext call. During the call, defendant apologized to G.M. about "the fact that I fucking punched the wall" and "that I fucking grabbed you and I was fucking like going crazy." G.M. reminded defendant that he had been "putting your hands down my pants and wanting to like feel me up and all that stuff when I kept telling you no," that he had "forced [him]self on me," and that he had "laid on top of me and didn't let me get up." Defendant agreed that his behavior was "not right." He explained, "I was just so fucking mad."

### C.     February 2, 2012 Incident (Contempt)

On February 2, 2012, defendant called G.M. 18 times between 3:18 a.m. and 3:34 a.m. Restraining orders filed on October 18, 2011 and January 27, 2012 prohibited defendant from contacting G.M.

### D.     March 8, 2012 Incident (Threat and Contempt)

On March 8, 2012, defendant called G.M. while she was talking to her uncle on the phone. Defendant heard G.M. say, "Juan," her uncle's name. He asked her, "who the fuck is Juan" and threatened to kill G.M. and Juan. Defendant said that he "didn't care anymore, if he didn't have [her], no one was gonna have [her]." Defendant called G.M. 14 times between 6:36 p.m. and 6:51 p.m. that day.

After G.M. called the Sheriff's Department again, a deputy located and interviewed defendant. Defendant acknowledged that he had been ordered not to contact G.M., and he initially denied that he had "seen her or anything." Defendant then admitted he called G.M. "every night," just to "hear her voice," but he claimed that he did not say anything to her when he called. Defendant also admitted he had called G.M. that day. Defendant denied threatening G.M., but he admitted that he had been yelling at her. He then admitted that he had asked her, "Who the fuck is Juan" and told her, "you watch, you watch, I'm going to jail because of all of this." Defendant said he only threatened to kill himself. Defendant's interview was played for the jury.

4

### E. Prior Domestic Violence

The prosecution introduced evidence that defendant had committed domestic violence on prior occasions. Two incidents involved G.M.; the other involved C.S., the mother of defendant's son.

#### 1. October 13, 2000 Incident (C.S.)

On May 24, 2001, defendant was convicted of violating section 243, subdivision (e)(3). The victim of that offense was C.S., the mother of defendant's son. The conviction "resulted from an incident on October 13, 2000, in which case [defendant] wil[l]fully and unlawfully used force and violence on the person of [C.S.]"

#### 2. May 11, 2008 Incident (G.M.)

On May 11, 2008, defendant broke down the door to G.M.'s apartment. He thought G.M. had another man in her bed. He grabbed G.M. by the neck, using two hands. Defendant was convicted of misdemeanor domestic violence on August 1, 2008.

#### 3. February 2009 Incident (G.M.)

In February of 2009, G.M. attended a concert in San Jose with defendant and another couple: C.E. and her boyfriend. G.M. and defendant got kicked out of the concert because they were loudly arguing over defendant's use of marijuana. G.M. told defendant she wanted to stay with a girlfriend in Santa Clara, but defendant would not let G.M. call her friend. Defendant hit G.M. and forced her to get into the car they had come in. Defendant asked the driver to lock the doors to keep G.M. from getting out. When G.M. returned to Santa Cruz, she spoke with a police officer. She had no visible injuries, but defendant had a scratch on his face. G.M. was arrested but not convicted. Defendant was not arrested nor convicted.

### F. Defense Evidence

C.E. testified about the incident in 2009. G.M. was "pretty aggressive" at the concert: she was loud and drunk, and on the ride home, G.M. was kicking and screaming. Defendant was trying to calm her down, and he was holding her in order to

5

restrain her. C.E. told a detective that G.M. was verbally and physically abusing defendant as they left the concert, and that defendant told G.M. to stop hitting him during the car ride home. C.E. also stated that she tried to help defendant restrain G.M. from jumping out of the car. G.M. kicked C.E. in the face and tried to choke C.E.'s boyfriend with a seatbelt.

Two of defendant's coworkers testified that defendant received a high number of calls at work. Both coworkers had heard G.M.'s voice on some of the calls. Once, after one of the coworkers had answered the phone and told G.M. that defendant was unavailable, G.M. had raised her voice. The other coworker had overheard G.M.'s voice on some calls to defendant and described G.M. as sounding "very aggressive." G.M. had once called defendant at work 10 times in one day.

Defendant testified that his relationship with G.M. involved a lot of emotional and physical abuse. He admitted that on five or six occasions, he had grabbed G.M. by the shoulders and shaken her. G.M. would throw things at him, and he would throw things at her. G.M. would call him often at work, during both good and bad times. They both were often jealous, believing that the other person was cheating. It would be "upsetting" to him when G.M. did not want to have sex with him, and he would get mad.

Defendant admitted breaking G.M.'s door during the May 11, 2008 incident. He acknowledged he had been "really mad" and had been calling G.M. "nonstop" because he thought she was with someone else. He had "rammed" the door with his shoulder, but he denied trying to choke G.M.

Regarding the 2009 concert incident, defendant admitted he and G.M. argued over his use of marijuana. Defendant claimed G.M. slapped him on the chest during the concert and that she bit him when he was trying to restrain her in the car. G.M. also hit him and scratched him.

Regarding the incident on March 5, 2011, defendant admitted being at G.M.'s home. He knew there was a restraining order in place, but he thought G.M. had

6

"modified" it because she had been visiting him when he was "incarcerated in '09."
Defendant admitted seeing a photo on G.M.'s cell phone and getting "really pissed off."
Defendant admitted waking G.M. up, grabbing her by the shoulders, and asking her "who
the fuck is this." He admitted getting "more mad" when G.M. claimed not to know how
the photo got on her phone. He admitted using "[e]very name in the book" and breaking
the headboard, but he denied hitting G.M.

Defendant admitted going to G.M.'s home in January of 2012. He denied that
G.M. told him to leave when he arrived. He admitted picking her up and carrying her to
the bedroom but denied that G.M. told him to put her down. He admitted laying next to
G.M. on the bed and claimed that she began to rub against him. He admitted putting his
hand down her pants and keeping it there after she said no. He claimed he took his hand
out after G.M. said no a second time, and that he never penetrated her vagina. Defendant
admitted accusing G.M. of "fucking somebody else" and speaking to her "in a raging
tone." He admitted punching a hole in the wall and leaving the voicemail messages for
her the next day. Regarding the pretext call, defendant claimed he had apologized in
order to "just move forward." Defendant stated that at the time, he had been attending
counseling and a program called Men Overcoming Abusive Behavior (MOAB) for
10 years.

Defendant acknowledged that a restraining order issued on January 27, 2012
prohibited him from contacting G.M. but that he called her 21 times on February 2, 2012
after getting "bailed out" of jail. Defendant admitted calling G.M. 95 times on another
day.

Defendant admitted having a telephone conversation with G.M. in March of 2012
in which he asked her, "who the fuck's Juan." He claimed that he did not threaten to kill
G.M. during that call, but he told her, "if I flip out, I'm going to prison," and that he
would kill himself. Defendant knew that the no contact order was still in place at the
time he called G.M.

Defendant admitted having three prior misdemeanor convictions: a 2001 conviction of giving false information to a police officer in violation of section 148.9, a 2001 conviction of battery on the mother of his child in violation of section 243, subdivision (e)(1), and a 2008 conviction of battery on the mother of his child in violation of section 243, subdivision (e)(1). Defendant explained that he provided a false name to a police officer when he was found with C.S. after being ordered to have no contact with her.

### G. Charges, Convictions, and Sentencing

The District Attorney filed a second amended information charging defendant with sexual penetration with a foreign object (§ 289, subd. (a)(1)), inflicting corporal injury on the mother of his child (§ 273.5, subd. (a)), false imprisonment by violence (§ 236), misdemeanor vandalism (§ 594, subd. (a)), criminal threats (§ 422), three counts of misdemeanor violation of a protective order (§ 166, subd. (c)(1)), misdemeanor battery on the mother of his child (§ 243, subd. (e)(1)), and possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)). The information alleged that defendant was on bail when he committed the criminal threats count. (§ 12022.1.)

Defendant admitted the on bail enhancement prior to trial on the substantive offenses. The trial court bifurcated the possession of methamphetamine count. The jury was unable to reach a verdict on the sexual penetration with a foreign object count, but it convicted defendant of the other eight counts. Defendant then pleaded no contest to possession of methamphetamine.

At the sentencing hearing held on September 5, 2012, the trial court imposed a five-year, eight-month sentence, consisting of the three-year midterm for inflicting corporal injury on the mother of his child, a consecutive eight-month term for criminal threats, and a consecutive two-year term for the on-bail enhancement. The trial court imposed a concurrent two-year term for possession of methamphetamine and stayed imposition of sentence for false imprisonment. The trial court ordered defendant to pay

8

various fees and fines, including $200 to a women's shelter and $200 to a domestic violence fund.

## III.    DISCUSSION

### A.    *Ineffective Assistance of Counsel*

Defendant contends he received ineffective assistance of counsel because his trial attorney did not object when the trial court admitted evidence, pursuant to Evidence Code section 1109, that defendant committed a prior domestic violence offense more than 10 years before the charged offenses.  According to defendant, due to trial counsel's ineffectiveness, we should reverse his convictions of infliction of corporal injury on a spouse (§ 273.5, subd. (a)), false imprisonment (§ 236), and battery (§ 243, subd. (e)(1)).[3]

### 1.    Evidence Code Section 1109

Evidence Code section 1109, subdivision (a)(1) provides:  "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Evidence Code section 1109, subdivision (e) provides:  "Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

---

[3] The trial court instructed the jury, pursuant to CALCRIM No. 852, that it could consider defendant's prior domestic violence in determining his guilt only with respect to the charge of penetration with a foreign object (§ 289, subd. (a)), as to which the jury did not reach a verdict, and the charges of infliction of corporal injury on a spouse (§ 273.5), and battery on the mother of defendant's child (§ 243, subd. (e)(1)).  That limiting instruction also told the jury that if it concluded that defendant committed the uncharged domestic violence, "that conclusion is only one factor to consider along with all the other evidence" and it was "not sufficient by itself to prove that the defendant is guilty."

9

## 2. Proceedings Below

The prosecution filed a motion in limine seeking to introduce evidence of defendant's prior domestic violence convictions pursuant to Evidence Code section 1109. The prosecution also sought to introduce defendant's two prior domestic violence convictions for purposes of impeachment and pursuant to Evidence Code section 1101, subdivision (b).[4]

The prosecution's Evidence Code section 1109 motion stated, "The Defendant has two prior convictions of Penal Code Section 243(e)(1): on May 24, 2001 and on August 1, 2008." The motion further specified that the first charged incident occurred on March 5, 2011 and that "[t]he prior acts of domestic violence occurred in May 2001 through 2012, which clearly is within ten years of [the charged offenses]." In fact, as the trial court later informed the jury, defendant's May 24, 2001 conviction of violating section 243, subdivision (e)(3) "resulted from an incident on October 13, 2000, in which case [defendant] willfully and unlawfully used force and violence on the person of [C.S.]" Thus, defendant's 2001 conviction of violating section 243, subdivision (e)(3) was based on "acts occurring more than 10 years before the charged offense[s]." (Evid. Code, § 1109, subd. (e).)

At the hearing on motions in limine, the trial court indicated it was inclined to grant the prosecution's motion to admit defendant's prior domestic violence convictions pursuant to Evidence Code section 1109, with a "ten-year cutoff, ten years from the date of the first [charged] offense." Trial counsel objected to the admission of any prior convictions involving a different victim than G.M., and he objected to introduction of the

---

[4] Evidence Code section 1101, subdivision (b) permits "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

10

prior convictions by way of documentary evidence only. The trial court overruled those objections.

After the trial court granted the prosecution's motion to admit the prior domestic violence evidence pursuant to Evidence Code section 1109, the prosecution withdrew its motion to admit that same evidence pursuant to Evidence Code section 1101, subdivision (b).

### 3.     Standard for Ineffective Assistance of Counsel Claims

"To prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.] When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., [a reasonable probability] that ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*); see also *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland*).)

### 4.     Analysis

During motions in limine, the prosecution represented that defendant's 2001 domestic violence conviction was based on "acts" that had occurred within 10 years of the charged offenses. When the trial court admitted evidence of defendant's prior domestic violence offenses pursuant to Evidence Code section 1109, the court indicated it was only admitting offenses that had occurred within "ten years from the date of the first [charged] offense." However, defendant's 2001 conviction was actually based on an offense that had occurred in October of 2000, which was over 10 years before the date of

11

the first charged offense.  Trial counsel did not object on this basis when the evidence was introduced.

Defendant contends that trial counsel had no possible tactical reason for failing to object on the ground that the 2001 conviction was based on an offense committed more than 10 years before any of the charged offenses.  Defendant points out that trial counsel did make other objections to the evidence of his prior domestic violence.  The Attorney General concedes that defendant's claim of deficient performance "may have merit."  We will assume that reasonable trial counsel would have objected to the admission of the 2001 conviction on the ground that the underlying conduct occurred more than 10 years prior to the date of defendant's first current offense, and we turn to the question of whether defendant has demonstrated prejudice.  (See *Anderson, supra,* 25 Cal.4th at p. 569; *Strickland, supra,* 466 U.S. at p. 694.)

Defendant contends the case was close, noting that there were no other witnesses to these incidents and that there was evidence that G.M. had engaged in emotionally and physically abusive behavior towards defendant.

We do not agree that any deficient performance was prejudicial in this case.  First, even if trial counsel had objected to the admission of defendant's 2001 conviction on the basis that the underlying conduct had occurred over 10 years before any of the charged conduct, the trial court had discretion to admit the evidence in the "interest of justice" pursuant to Evidence Code section 1109, subdivision (e).  The trial court also had discretion to admit the evidence pursuant to Evidence Code section 1101, subdivision (b), as initially requested by the prosecution.  Particularly since defendant's 2001 conviction was based on conduct that had occurred just five months outside the 10-year period, the trial court could have reasonably determined that the evidence was admissible in the "interest of justice" (Evid. Code, § 1109, subd. (e)) because the evidence was " 'more probative than prejudicial.' "  (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 538, 539-540 ["the 'interest of justice' exception is met where the trial court engages in a

12

balancing of factors for and against admission under [Evidence Code] section 352 and concludes . . . that the evidence was 'more probative than prejudicial' "].) The fact that defendant committed a prior battery on the mother of his son was relevant to issues such as motive and intent. (See Evid. Code, § 1101, subd. (b).) Moreover, the evidence of the 2001 conviction and underlying conduct was very brief, and thus it was not inflammatory and posed little potential for confusion of issues. (See Evid. Code, § 352.)

Second, even if the trial court had excluded the evidence of defendant's 2001 prior domestic violence conviction, there is no "reasonable probability" that "the result of the proceeding would have been different." (See *Anderson, supra,* 25 Cal.4th at p. 569; *Strickland, supra,* 466 U.S. at pp. 687-688.) Contrary to defendant's argument, the evidence was not close. Defendant corroborated much of G.M.'s testimony concerning each incident. He admitted violating the restraining orders on several occasions. He admitted violent conduct, including breaking G.M.'s front door, breaking the headboard of G.M.'s bed, and punching a hole in G.M.'s bedroom wall. Defendant admitted grabbing G.M. by the shoulders and shaking her on five or six occasions. Concerning the March 5, 2011 incident, for which he was convicted of battery, defendant admitted grabbing G.M. by the shoulders, getting angry, and calling her "[e]very name in the book." Regarding the January 24, 2012 incident, for which he was convicted of inflicting corporal injury and false imprisonment, defendant admitted picking G.M. up and carrying her to the bedroom, speaking to G.M. "in a raging tone," punching the hole in the wall, and leaving threatening voicemail messages for her the following day, which the jury heard. Further, two witnesses observed bruises on G.M.'s arms the next day. On this record, there is no reasonable probability that, without the evidence of defendant's 2001 prior conviction, any of the jurors would have disbelieved G.M.'s testimony about defendant hitting her on March 5, 2011 and about defendant picking her up against her wishes and inflicting corporal injury on her during the January 24, 2012 incident. (See *Anderson, supra,* 25 Cal.4th at p. 569; *Strickland, supra,* 466 U.S. at pp. 687-688.)

### B. Constitutionality of Evidence Code Section 1109

Defendant contends that his constitutional right to due process was violated when the trial court admitted evidence of his 2001 and 2008 prior domestic violence convictions pursuant to Evidence Code section 1109. He contends that Evidence Code section 1109 "is unconstitutional on its face and as applied, because it authorizes the admission of evidence of prior acts of domestic violence solely to prove a propensity to commit the crime charged, and substantially increases the risk of an erroneous conviction."

Defendant acknowledges that the California Supreme Court addressed a similar argument when it upheld the admission of prior sex crimes pursuant to Evidence Code section 1108, in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*). He also acknowledges that several appellate courts have found the reasoning of *Falsetta* applicable to the admission of prior domestic violence pursuant to Evidence Code section 1109. (See *People v. Cabrera* (2007) 152 Cal.App.4th 695, 704 (*Cabrera*) ["Since *Falsetta* was decided, several cases from the California Courts of Appeal have applied its reasoning to reject claims that admission of prior acts of domestic violence pursuant to section 1109 violates due process."].)

Nevertheless, defendant contends that United States Supreme Court decisions "strongly suggest" that the high court "would bar the admission of prior crimes to prove a defendant's disposition to commit the charged crime under the Due Process Clause of the Fifth and Fourteenth Amendments." He notes that the United States Supreme Court has referred to the evidentiary rule against the admission of prior offenses to show guilt as "historically grounded." (See *Brinegar v. United States* (1949) 338 U.S. 160, 174.)

In *Falsetta,* the California Supreme Court explained that a statute violates due process if it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (*Falsetta, supra,* 21 Cal.4th at p. 913.) The court acknowledged that "[f]rom the standpoint of historical practice, unquestionably

14

the general rule against admitting [propensity] evidence is one of long-standing application." (*Ibid.*) However, the court pointed out, "a long-standing practice does not necessarily reflect a *fundamental*, unalterable principle embodied in the Constitution." (*Id.* at p. 914.) Since "the rule against admitting evidence of the defendant's other bad acts to prove his present conduct" had already been "subject to far-ranging exceptions," a new statutory exception applicable in sex offense cases did not necessarily offend fundamental historical principles. (*Ibid.*)

The *Falsetta* court noted that, according to some authorities, courts had been "considerably more 'ambivalent' about prohibiting admission of defendants' other sex crimes in sex offense cases," and that such evidence was often admitted. (*Falsetta, supra,* 21 Cal.4th at p. 914.) The court thus found it "unclear whether the rule against 'propensity' evidence *in sex offense cases* should be deemed a fundamental historical principle of justice." (*Ibid.*)

Ultimately, the *Falsetta* court did not decide whether the rule against admission of propensity evidence should be "deemed fundamental from a historical perspective" in sex offense cases. (*Falsetta, supra,* 21 Cal.4th at p. 915.) Instead, it determined that Evidence Code section 1108 "did not unduly 'offend' those fundamental due process principles . . . in light of the substantial protections afforded to defendants" by the statute. (*Ibid.*) The court then reviewed those protections. First, Evidence Code "section 1108 is limited to the defendant's *sex offenses*, and it applies only when he is charged with committing *another sex offense*." (*Id.* at p. 916.) In addition, the statute "requires *pretrial notice* of the offenses sought to be proved, assuring that the defendant will not be surprised or unprepared to rebut the proposed evidence." (*Ibid.*) Further, the admission of propensity evidence pursuant to Evidence Code section 1108 is still subject to limitation and exclusion pursuant to Evidence Code section 352, which "affords defendants a realistic safeguard" against prejudice. (*Id.* at p. 918.)

15

Like Evidence Code section 1108, Evidence Code section 1109 affords defendants "substantial protections" that ensure the propensity evidence will not lead to a fundamentally unfair trial. (*Falsetta, supra,* 21 Cal.4th at p. 915.) Evidence Code section 1109 is limited to evidence of the defendant's prior domestic violence, and it applies only when he is charged with committing a crime involving domestic violence. (See *id.* at p. 916.) Evidence Code section 1109 is also subject to the limitations of section 352. Under the reasoning of *Falsetta,* this limitation ensures that Evidence Code section 1109 does not violate the due process clause. (See *Cabrera, supra,* 152 Cal.App.4th at pp. 703-704; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096; *People v. James* (2000) 81 Cal.App.4th 1343, 1353; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1335; *People v. Johnson* (2000) 77 Cal.App.4th 410, 417-420.) We therefore reject defendant's due process challenge to section 1109.

### C.  *Domestic Violence Fund and Women's Shelter Fees*

Defendant contends—and the Attorney General concedes—that the trial court erred by ordering him to pay a $200 fee to a women's shelter and a $200 domestic violence fund fee. Defendant points out that these fees are authorized by section 1203.097 only when probation is granted, and that there is no other statutory authority for imposing these fees when a defendant is sentenced to state prison.

Section 1203.097, subdivision (a) mandates certain terms of probation for a person who is "granted probation for a crime in which the victim is a person defined in Section 6211 of the Family Code." Such a person must be ordered to pay a fee of at least $500, depending on his or her ability to pay. (§ 1203.097, subd. (a)(5)(A).) Two-thirds of the fee goes to "the domestic violence programs special fund created pursuant to Section 18305 of the Welfare and Institutions Code," and the remaining one-third goes to "the Domestic Violence Restraining Order Reimbursement Fund" and "the Domestic Violence Training and Education Fund." (*Id.*, subds. (a)(5)(B) & (a)(5)(C).) Such a

person may also be required to "make payments to a battered women's shelter, up to a maximum of five thousand dollars ($5,000)." (*Id.*, subd. (a)(11)(A).)

The Attorney General agrees that the fees were unauthorized because defendant was not granted probation, and we find the concession appropriate. We will therefore order these two fees stricken.

## IV.    DISPOSITION

The orders requiring defendant to pay a $200 fee to a women's shelter and a $200 domestic violence fund fee are stricken. As modified, the judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MIHARA, J.

_____
GROVER, J.