Filed 8/10/15  P. v. Wilson CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B257896 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA087394) |
| v. | |
| MARCUS ANTONIO WILSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rudolph A. Diaz, Judge.  Affirmed.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Marcus Antonio Wilson was convicted, following a jury trial, of two counts of corporal injury to a cohabitant in violation of Penal Code section 273.5, subdivision (a), and one count of forcible rape in violation of Penal Code section 261. Appellant admitted that he had suffered a prior conviction for domestic violence within the meaning of Penal Code section 273.5, subdivision (e)(1). The trial court sentenced appellant to a total term of 10 years in state prison, consisting of the mid-term of four years for the count 1 corporal injury conviction plus the mid-term of six years for the rape conviction. The court stayed sentence on the count 2 corporal injury conviction.

Appellant appeals from the judgment of conviction, contending the trial court abused its discretion in instructing the jury with CALCRIM No. 362 concerning consciousness of guilt and in admitting propensity evidence pursuant to Evidence Code[1] section 1109. Appellant further contends that the trial court erred in denying his motion for a new trial based on ineffective assistance of counsel. We affirm the judgment of conviction.

Facts

Appellant and J.B. (J.B.) met in Los Angeles in 2003. They soon began living together. Shortly thereafter, appellant became verbally and physically abusive toward J.B. He slapped and bit her. In 2004 or 2005, the couple had their first daughter, K.

The couple lived on J.B.'s disability income, which she received for a head injury suffered before she met appellant. In 2009, they moved to Louisiana because it had a lower cost of living. Appellant had family there. Appellant's physical abuse of J.B. continued. J.B. suffered many black eyes.

At some point, J.B. moved from Louisiana to Indiana with her daughter K. J.B.'s father lived in Indiana. Appellant followed. While J.B. was in Indiana, she gave birth to the couple's second child, M. Appellant continued to physically abuse J.B. In one

---

[1] All further statutory references are to the Evidence Code unless otherwise specified.

2

incident, he whipped her with a belt and dragged her around by the hair. Appellant returned to Los Angeles after J.B. (falsely) told him she had reported the incident to the police.

J.B. subsequently moved from Indiana to Las Vegas. At some point, appellant joined her in Las Vegas. He again abused her. On January 15, 2013, he bit her breast, bruising it. He also hit her in the mouth and bloodied it. A neighbor called the police. Appellant ultimately sustained a conviction for domestic violence in January 2013.

At some point after January 2013, J.B. moved back to Los Angeles alone. Soon thereafter, appellant joined her. About a month later, the physical abuse resumed.

On April 2, 2013, as appellant and J.B. were walking to the liquor store, appellant became angry and punched J.B. in the eye. Two days later, J.B.'s mother saw the black eye and took her to the police station to report the attack. Police took photos. J.B. falsely told police that appellant did not live with her.

On May 10, 2013, J.B. wanted to go to her sister's house, but appellant did not want her to spend time with her family. Appellant scratched her arms and bit the top part of her left arm, causing a bruise.

On May 11, 2013, J.B. went out with her sister, returning home about 5:00 p.m. Appellant demanded sex. J.B. declined. Appellant punched her in the face, and forced her onto the couch. She crossed her legs, but appellant pulled her pants down, tore off her underwear and bit her vaginal area. Appellant then inserted his penis into J.B.'s vagina. After five or six minutes, appellant finished and went to the bathroom to take a shower. J.B. left at about 6:00 p.m. She had multiple bruises on her legs.

J.B. went to her mother's house, then went with her sister to a party hosted by appellant's mother. After the party, J.B. returned to her mother's house. Her mother made J.B. take her clothes off. J.B. complied, and her mother saw bite marks on J.B.'s arms and legs. Her mother drove her to the police station, but it was closed. She then drove to J.B.'s apartment, parked outside and called 911.

At 11:48 p.m., Los Angeles County Sheriff's Deputy Javier Estrella arrived at J.B.'s apartment. He saw swelling on the side of J.B.'s face. J.B. told the detective that

3

appellant had struck her in the face and bit her on the abdomen. She also told the deputy about the incident the day before when appellant scratched her. She did not mention the rape. The deputy responded to other calls several times during his interview of J.B. When the interview was finished, Deputy Estrella knocked on the door to J.B.'s apartment. Appellant answered and was arrested.

On May 12, 2013, Detective Jamie Yamasaki interviewed J.B. telephonically. J.B. repeated what she had told Deputy Estrella, and also stated that appellant had raped her. A few days later, Detective Yamasaki met with J.B. and took photographs of the bruises on her legs.

At trial, appellant's mother Salena Carter testified on his behalf. She stated that she did not see any injuries on J.B. during the party on May 11. She also stated that J.B. arrived at the party at 5:30 and left at 7:50. Appellant's mother claimed to have never seen any signs that appellant inflicted abuse on J.B. Appellant's mother was unaware of appellant's conviction for domestic violence in Las Vegas.

Appellant testified on his own behalf. He stated that he had been employed in various jobs throughout his ten-year relationship with J.B. He never hit J.B. or called her names. About a year after their relationship began, J.B. became a heavy drinker. When she was drunk, she would become violent and attack him. Appellant tried to get help for J.B., but the help was never successful.

Appellant testified that the January 2013 incident in Las Vegas began when J.B. became inebriated, called him names, grabbed a knife from the kitchen and ran at him. Appellant took the knife away from her, but she then bit and kicked him. He bit back in self-defense. The neighbors called the police. Appellant pled guilty to a misdemeanor because he wanted to be released quickly so that he could be with his daughter. Appellant did not tell the police about the knife because he did not want J.B. to go to jail.

Appellant denied that he hit J.B. on April 2, 2013, in Los Angeles. He stated that J.B. received the black eye earlier when they were still living in Las Vegas. There, J.B. argued with an unidentified woman on the way to the liquor store, and the woman hit her. Appellant testified that he was never contacted by the police about the incident.

4

According to appellant, the scratching incident which formed the basis of the count 1 corporal injury charge occurred on Thursday, May 9, 2013. J.B. went out to a club with her sister and returned drunk. She urinated on herself, then threw a backpack at appellant when he tried to ask her questions about her evening. She tried to scratch him, but he grabbed her arms and restrained her. He did not bite her.

The next day, May 10, J.B. told him that she was going shopping for Mother's Day presents with their three-year-old daughter M. Appellant did not see any scratches on J.B.'s body as she got dressed to go out. Appellant walked J.B. and M. to the bus stop at about 1:30 p.m. The next time he saw her was about 2:00 a.m. on May 12, when she returned with sheriff's deputies.

Appellant denied telling Detective Yamasaki that J.B. was home with him on May 10, 2013, and they drank alcohol together. He denied that the backpack throwing incident occurred on May 10 and denied telling the detective that it did. He told the detective that J.B. left on May 10 at about 1:30 p.m. with M.

Detective Yamasaki testified on rebuttal that he interviewed appellant on May 12, 2013. He asked appellant about the May 10 incident. Appellant replied that he and J.B. were home drinking when they began insulting each other. J.B. threw a backpack at him. He grabbed her arms in an attempt to calm her down, scratching her arms in the process. They continued to drink until 7:00 or 8:00 p.m., when J.B. left the house and did not return.

Discussion

1. CALCRIM No. 362

The court instructed the jury with CALCRIM No. 362, which permits the jury to infer awareness of guilt from a defendant's false or misleading pretrial statement about the crime. Appellant contends the trial court erred in giving this instruction because there was no evidentiary basis for it and it violated his right to a fair trial. Appellant did not object to CALCRIM No. 362 on any ground. Accordingly we review the instruction only to determine if it affected his substantial rights. (Pen. Code, § 1259.) It did not.

a. Instruction

CALCRIM No. 362 as given provided: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself." There is no discussion of this instruction in the record.

b. Constitutional challenges

Appellant contends the instruction violated his state and federal rights to due process, an impartial jury, and a presumption of innocence. Appellant acknowledges that the California Supreme Court has repeatedly rejected constitutional challenges to CALJIC No. 2.03, the predecessor instruction to CALCRIM No. 362. (See *People v. Howard* (2008) 42 Cal.4th 1000, 1025.) He indicates that he makes these claims to preserve them for federal review.

Appellant specifically contends the instruction was improper because it was not accompanied by an instruction telling the jury that other evidence might be indicative of innocence. The California Supreme Court has held that a defendant has no right to such an instruction. (*People v. Green* (1980) 27 Cal.3d 1, 38 [holding that defendant has no

6

right to instruction that the fact that defendant did not flee was evidence indicating innocence].) He also contends the jury instruction contains a permissive inference which violates the due process clause of the Fourteenth Amendment, is an improper pinpoint instruction, and should not be given when appellant's mental state at the time of the offense is in dispute. The California Supreme Court has rejected these claims when used to challenge CALJIC No. 2.03, the predecessor instruction to CALCRIM No. 362. (*People v. Ashmus* (1991) 54 Cal.3d 932, 977 [permissive inference]; *People v. Kelly* (1992) 1 Cal.4th 495, 531-532 [pinpoint instruction]; *People v. Breaux* (1991) 1 Cal.4th 281, 304 [mental state].) We agree with our colleagues in the Third District Court of Appeal that "although there are minor differences between CALJIC No. 2.03 and CALCRIM No. 362 . . . none is sufficient to undermine our Supreme Court's approval of the language of these instructions." (*People v. McGowan* (2008) 160 Cal.App.4th 1099, 1104.) Accordingly, we are bound to follow to follow the decisions of our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### c. Evidentiary claim

Appellant contends the trial court erred in instructing the jury with CALCRIM No. 362 because there was no evidentiary basis for it. He claims there is no significant difference between his pretrial statement to police and his testimony at trial, and so no evidence that the pretrial statement was false apart from J.B.'s testimony.[2]

Appellant focuses on the portion of his pretrial statement which describes the details of the scratching incident. However, appellant also discussed J.B.'s actions after the scratching incident, claiming that she left after the incident and never returned. Although there was no discussion of CALCRIM No. 362 at all during trial, the prosecutor's closing argument indicates that she was relying on appellant's statement that J.B. left after the scratching incident. During closing argument, the prosecutor stated,

---

[2]     To the extent that appellant contends that CALCRIM No. 362 is inapplicable to situations where a defendant's pretrial statements to police and his trial testimony are consistent, appellant is mistaken. (*People v. Kimble* (1988) 44 Cal.3d 480, 498.)

7

"[T]his man wants you to believe that for 36 hours from May 10th at 1:30 p.m. when he last sees his three-year old daughter get on the bus with the violent, unpredictable, raging alcoholic and not return for 36 hours, that he does nothing, except send one text. That is illogical, unreasonable, and totally 100 percent not credible. That doesn't make any sense." This is the only statement by appellant relating to the current charges that the prosecutor directly argued was false.

Appellant's pretrial statement that J.B. left after the scratching incident is a denial that he raped and injured J.B. on May 11. It suggests that someone else committed those crimes. If false, it would support giving CALCRIM No. 362.

As was the case with appellant's trial testimony, the jury could find appellant's pretrial statement about J.B.'s departure inherently unbelievable. In appellant's pretrial statement an extremely intoxicated J.B. left home one night and never returned, yet he did nothing at all about the disappearance of the mother (and historically the primary caretaker) of his daughter. Further, there were significant differences between appellant's pretrial statement to police about J.B.'s departure and his trial testimony. In the pretrial version, J.B. left alone the night of the incident. At trial, she left the next day with her daughter. Based on these differences, a jury could find both statements to be fabrications. Thus, there was an evidentiary basis for CALCRIM No. 362.

2. Section 1109

Pursuant to section 1109, the trial court permitted the admission of multiple prior uncharged assaults and rapes of J.B. by appellant over a ten year period. [3] Appellant contends the admission of this propensity evidence under section 1109 deprived him of equal protection and his due process right to a fair trial.

---

[3]     Evidence Code section 1109 provides in pertinent part, "[e]xcept as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

8

Respondent contends that appellant has forfeited these claims by failing to object to the evidence on constitutional grounds. (See *People v. Burgener* (2003) 29 Cal.4th 833, 869 [claim that improper admission of evidence violated due process waived by failure to raise it in trial court].) Respondent is correct. However, even assuming that appellant has preserved his claims, it is well settled under California law that section 1109 does not violate a defendant's right to due process and equal protection.

a. Due process

Appellant contends that section 1109 violates due process because it renders a trial fundamentally unfair. Appellant acknowledges that the California Supreme Court has held that section 1108, which permits the admission of evidence of a defendant's other sexual offenses when he is on trial for a sexual offense, satisfies due process because it requires that a defendant be given pretrial notice of the offenses to be used and gives the trial court discretion to exclude evidence under section 352 if its prejudicial potential outweighs its probative value. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917-918 (*Falsetta*).)

As appellant also acknowledges, California courts have relied on the reasoning of *Falsetta* to uniformly reject due process challenges to section 1109. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 529; *People v. Williams* (2008) 159 Cal.App.4th 141, 146-147; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310-1311 (*Jennings*); *People v. Brown* (2000) 77 Cal.App.4th 1324, 1331-1334; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1025-1030.)

Appellant asks us to find that the reasoning of *Falsetta* should not be applied to section 1109 in light of subsequent intermediate federal court opinions, particularly *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769. Even if we were free to depart from the reasoning of *Falsetta* with respect to section 1109, we would not do so.

We agree with the reasoning of the courts of appeal in the cases cited above. In particular, we agree that section 352 provides "'a realistic safeguard that ensures that the

presumption of innocence and other characteristics of due process are not weakened by an unfair use of evidence of past acts.' (*People v. Harris* (1998) 60 Cal.App.4th 727, 730.)" (*People v. Brown, supra*, 77 Cal.App.4th 1324, 1334.) Further, several federal circuit courts of appeal, including the Ninth Circuit, have found admission of uncharged sex crimes in sex offense cases is not a violation of due process. Federal Rules of Evidence 413 and 414 permit the admission of evidence of uncharged sexual assaults in sexual offense cases and uncharged child molestation incidents in child molestation cases. (See *United States v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1026-1027; *United States v. Castillo* (10th Cir. 1998) 140 F.3d 874, 881; *United States v. Enjady* (10th Cir. 1998) 134 F.2d 1427, 1430-1435; *United States v. Mound* (8th Cir. 1998) 149 F.3d 799, 800-802; *Kerr v. Caspari* (8th Cir. 1992) 956 F.2d 788, 790.) This same reasoning applies to section 1109 and domestic violence offenses. Section 1109 does not violate defendant's due process rights.

### b. Equal protection

Appellant contends section 1109 violates the equal protection clause. Appellant acknowledges that at least two appellate courts have rejected an equal protection claim to section 1109. (*People v. Price* (2004) 120 Cal.App.4th 224, 240-241; *Jennings, supra*, 81 Cal.App.4th at pp. 1310-1313.) He argues the reasoning in those cases is flawed.

A statutory law violates the equal protection clause when it arbitrarily treats similarly situated individuals differently. (*People v. Romo* (1975) 14 Cal.3d 189, 196.) We will assume for the sake of argument that defendants charged with domestic violence offenses are similarly situated to all other criminal defendants. Because, as we discuss above, section 1109 does not violate due process, it satisfies equal protection requirements "if it simply bears a rational relationship to a legitimate state purpose." (*Jennings, supra*, 81 Cal.App.4th at p. 1312.)

As appellant acknowledges, the legitimate state purpose behind section 1109 is the prosecution of domestic violence offenses. However, he contends that section 1109 is both an over-inclusive and an under-inclusive means chosen by the legislature to advance

that purpose. Appellant does not dispute that domestic violence crimes, like sexual offenses, are committed in secret and often involve credibility issues. He argues that section 1109 is both over-inclusive because it is not limited to domestic violence cases where there are no witnesses and under-inclusive because it does not apply to other crimes which are committed in secret without witnesses.

We agree with the court in *Jennings* that like sex crimes, "domestic violence is quintessentially a secretive offense, shrouded in private shame, embarrassment and ambivalence on the part of the victim, as well as intimacy with and intimidation by the perpetrator. The special relationship between victim and perpetrator in both domestic violence and sexual abuse cases, with their unusually private and intimate context, easily distinguishes these offenses from the broad variety of criminal conduct in general. Although all criminal trials are credibility contests to some extent, this is unusually -- even inevitably -- so in domestic and sexual abuse cases, specifically with respect to the issue of victim credibility. The Legislature could rationally distinguish between these two kinds of cases and all other criminal offenses in permitting the admissibility of previous like offenses in order to assist in more realistically adjudging the unavoidable credibility contest between accuser and accused. The fact that other crimes such as murder and mayhem may be more serious and that credibility contests are not confined to domestic violence cases do not demonstrate the absence of the required rational basis for the Legislature's distinction between these crimes." (*Jennings, supra*, 81 Cal.App.4th at p. 1313.)

3. Motion for a new trial

Appellant moved for a new trial on the ground that his counsel was ineffective in failing to impeach J.B. with a prior conviction. He contends the trial court erred in denying this motion.

a.  Applicable law

A trial court's ruling on a motion for a new trial is reviewed for an abuse of discretion.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)  A trial court abuses its discretion when it acts in "an arbitrary, capricious or patently absurd manner that [results] in a manifest miscarriage of justice."  (*Ibid*.)

In order to establish ineffective assistance of counsel, a defendant must show that his counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

When an appellant makes an ineffective assistance claim on appeal, we look to see if the record contains any explanation for the challenged aspects of the representation.  If the record is silent, then the contention must be rejected "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' [citation]."  (*People v. Haskett* (1990) 52 Cal.3d 210, 248.)  "'"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"'  [Citations.]"  (*People v. Thomas* (1992) 2 Cal.4th 489, 530-531.)

b.  Trial court's ruling

In denying the motion for a new trial, the court stated, "[I]n terms of her not being 'impeached' with the grand theft conviction, I have been on the bench doing this for 16 years.  And I've seen many instances where defense counsel had chosen not to use something like this when there's a witness who potentially is very sympathetic to a jury as this witness was."  The court noted that there was no declaration from trial counsel, who was no longer representing appellant, and that "all I can assume is it was a tactical

decision because he -- this isn't something that he didn't know about it. . . . He knew. . . . I told him about it." The trial court also found that appellant was not a sympathetic witness, J.B. had corroboration for some of her claims and the use of the conviction to impeach J.B. "certainly wouldn't have changed the outcome."

c. Analysis

Appellant contends the trial court abused its discretion in finding that his trial counsel might have had a tactical reason for not impeaching J.B. Appellant argues that this case was almost entirely a credibility contest between him and J.B., his counsel vigorously attacked J.B.'s credibility during cross-examination and so would not have forgone using the conviction to impeach J.B. for tactical reasons. Appellant implies that his counsel had memory or organizational challenges and forgot to impeach J.B.

We agree with the trial court that a defense counsel may well forgo impeaching a sympathetic witness with a prior conviction as a tactical matter. Appellant's trial counsel did attack J.B.'s credibility in other ways. Although it is possible that counsel decided during cross-examination that his credibility attack was not being received favorably by the jury and so abandoned the use of the prior conviction, we will assume for the sake of argument that counsel did not have a tactical reason for his failure to use the conviction. We agree with the trial court it is not reasonably probable that appellant would have received a more favorable result if J.B. had been impeached with her prior theft-related conviction.

As the trial court pointed out, J.B. was a very sympathetic witness. There is no doubt that she was brutally attacked by someone in May 2013. Photographs of some of her injuries were shown at trial. J.B. was living with appellant at the time of the offenses in this case. In contrast to J.B., appellant was not a sympathetic witness. His defense to the May 11 rape and corporal injury charges was that J.B. left home before the time those incidents supposedly occurred. As we discuss above in section 1, appellant gave two different versions of J.B.'s departure and neither was particularly believable. Further, the record does not provide any evidence of who, apart from appellant, might have attacked

J.B., or why she would lie about the identity of her attacker. To the contrary, the record shows that J.B. had a long history of either keeping quiet about appellant's abuse or trying to cover it up. In this case, she was compelled by her mother to report the abuse. There is no reasonable probability that the jury would have found J.B. not credible about the abuse if it had known about her prior conviction and thus no reasonable probability that appellant would have received a more favorable result if the conviction had been introduced.

Disposition

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIRSCHNER, J.[*]

We concur:

TURNER, P.J.

KRIEGLER, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.